1    KARIN G. PAGNANELLI (SBN 174763)
        kgp@msk.com
2    MARC E. MAYER (SBN 190969)
        mem@msk.com
3    EMILY F. EVITT (SBN 261491)
        efe@msk.com
4    DANIEL A. KOHLER (SBN 285501)
        dxk@msk.com
5    MITCHELL SILBERBERG & KNUPP LLP
     11377 West Olympic Boulevard
6    Los Angeles, CA  90064-1683
     Telephone:   (310)-312-2000
7    Facsimile:   (310)-312-3100

8    Attorneys for Plaintiff
     Blizzard Entertainment, Inc.

9

10                    UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12

13   BLIZZARD ENTERTAINMENT,            CASE NO. 8:16-cv-01236 DOC (KESx)
     INC.,
14                                      Honorable David O. Carter
                  Plaintiff,
15                                      **OPPOSITION OF BLIZZARD
            v.                          ENTERTAINMENT, INC. TO
16                                      MOTION OF BOSSLAND GMBH
     BOSSLAND GMBH, a corporation;      TO DISMISS COMPLAINT FOR
17   and Does 1 through 10, inclusive,  LACK OF PERSONAL
                                        JURISDICTION**
18                Defendants.
                                        [DECLARATIONS OF JAMES
19                                      BERKLEY, CLINT RICE AND
                                        MATTHIAS WERNER FILED
20                                      CONCURRENTLY HEREWITH]

21                                      Date:       January 9, 2017
                                        Time:       8:30 a.m.
22                                      Courtroom:  9C, Santa Ana

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................1

II.     STATEMENT OF RELEVANT FACTS ......................................3

Blizzard and its Games.................................................................3

Bossland and its Malicious Software Products.................................4

Bossland's Knowing and Intentional Efforts to Harm Blizzard............5

Bossland's California and U.S. Sales Efforts....................................7

Bossland's U.S.-Based Contracts....................................................8

The German Lawsuit....................................................................10

III.    THIS COURT HAS SPECIFIC PERSONAL JURISDICTION .................10

        A.      The Legal Standard and Burden of Proof. ...........................10

        B.      Bossland Purposefully Directed its Activities at the Forum...............12

                1.      The Relevant Forum is the United States, but Bossland is
                        Subject to Jurisdiction even if the Forum is California............12

                2.      Bossland Does Not Challenge the Existence of the First and
                        Third Prongs of the Effects Test................................14

                3.      Bossland Expressly Aimed Intentional Acts at the United
                        States and at California............................................15

                4.      Blizzard's Claims Arise out of Bossland's U.S. Activity. .......21

                5.      The Exercise of Jurisdiction is Reasonable. ...........................21

IV.     ALTERNATIVELY, BLIZZARD IS ENTITLED TO DISCOVERY.........24

V.      CONCLUSION ...................................................................25

Mitchell
Silberberg &
Knupp LLP

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*AMA Multimedia LLC v. Sagan Ltd.*,
  2016 U.S. Dist. LEXIS 141934
  (D. Ariz. Oct. 13, 2016)...................................................13, 14, 17, 19, 21, 22, 24

*Apollo Educ. Grp., Inc. v. Somani*,
  2015 U.S. Dist. LEXIS 107439 (N.D. Cal. Aug. 13, 2015).............................13

*Ballard v. Savage*,
  65 F.3d 1495 (9th Cir. 1995)..........................................................................21

*Blizzard Entertainment, Inc .v. Ceiling Fan Software LLC*,
  28 F. Supp. 3d 1006 (C.D. Cal. 2013)..............................................................7

*Boschetto v. Hansing*,
  539 F.3d 1011 (9th Cir. 2008) ..................................................................11, 12

*Cal Brewing Co. v. 3 Daughters Brewing LLC*,
  2016 U.S. Dist. Lexis 52344 (E.D., Cal. April 18, 2016) .....................18, 19, 20

*Calder v. Jones*,
  465 U.S. 783 (1984) ................................................................................11, 20

*Circle Click Media LLC v. Regus Mgmt. Group LLC*,
  2014 U.S. Dist. LEXIS 146408 (N.D. Cal. Oct. 14, 2014).........................14, 15

*CollegeSource, Inc. v. AcademyOne, Inc.*,
  653 F.3d 1066 (9th Cir. 2011) ........................................................................14

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
  557 F.2d 1280 (9th Cir. 1977) ........................................................................25

*Davidson & Associates v. Jung*,
  422 F.3d 630 (8th Cir. 2005) ............................................................................3

*eMag Sols., LLC v. Toda Kogyo Corp.*,
  2006 U.S. Dist. LEXIS 94462 (N.D. Cal. Dec. 21, 2006) ................................25

*Goes Int'l, AB v. Dodur Ltd.*,
  2015 U.S. Dist. LEXIS 113365 (N.D. Cal. Aug. 26, 2015).............................13

*Int'l Order of Job's Daughters v. Lindeburg & Co.*,
  633 F.2d 912 (9th Cir. 1980)..........................................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell
Silberberg &
Knupp LLP

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Jeske v. Fenmore*,
   2008 U.S. Dist. LEXIS 100409 (C.D. Cal. Dec. 1, 2008)............................ 16, 21

*LiveCareer Ltd. v. Su Jia Techs. Ltd.*,
   2015 U.S. Dist. LEXIS 43287 (N.D. Cal. March 31, 2015) ................. 18, 19, 23

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) ................................................................ 11, 15, 18

*MDY Indus., LLC v. Blizzard Entertainment, Inc.*,
   629 F.3d 928 (9th Cir. 2010) ...................................................................... 4, 7

*Microsoft Corp. v. Mt. West Computers, Inc.*,
   2015 U.S. Dist. LEXIS 95663 (W.D. Wash. July 22, 2015)........................ 19, 20

*Monster Cable Prods. v. Euroflex S.R.L.*,
   642 F. Supp. 2d 1001 (N.D. Cal. 2009)............................................................ 12

*Mountz v. Northeast Indus. Bolting & Torque, LLC*,
   2016 U.S. Dist. LEXIS 157275 (N.D. Cal. Sept. 30, 2016)............................. 14

*Orchid Biosciences, Inc. v. St. Louis Univ.*,
   198 F.R.D. 670 (S.D. Cal. 2001) ..................................................................... 25

*Picot v. Weston*,
   780 F.3d 1206 (9th Cir. 2015) ............................................................ 11, 12, 19

*Rapture Shipping Ltd. v. Allaround Fuel Trading B.V.*,
   350 F. Supp. 2d 369 (S.D.N.Y. 2004) .............................................................. 23

*Rio Props. v. Rio Int'l Interlink*,
   284 F.3d 1007 (9th Cir. 2002) ......................................................................... 22

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ................................................................ 10, 11, 12

*Stomp, Inc. v. Neato*,
   61 F. Supp. 2d 1074 (C.D. Cal. 1999) ............................................................. 16

*Walden v. Fiore*,
   134 S. Ct. 1115 (U.S. 2014) ............................................................... 18, 19, 20

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
    704 F.3d 668 (9th Cir. 2012) .................................................................................. 19

### STATUTES

Digital Millennium Copyright Act ("DMCA") § 1201(a)(2) .................................... 7

### OTHER AUTHORITIES

Fed. R. Civ. P. 4(k)(2) ............................................................................. 12, 13, 17, 21

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

## I.     INTRODUCTION

Blizzard Entertainment, Inc. ("Blizzard") is an Irvine, California-based company and one of the world's leading developers and publishers of computer games, including the massively popular online games "World of Warcraft," "Diablo III" and "Overwatch."  Blizzard brought this case to stop the deliberate and ongoing unlawful conduct of defendant Bossland GmbH ("Bossland"), an international company whose business is based on the sale of malicious software products, primarily those with the sole purpose of damaging Blizzard's games by enabling players to cheat.

While Bossland paints itself as a German company with no ties to the United States (or California), that is false.  In fact, Bossland has: (1) distributed thousands of copies of its software products in the United States though its highly interactive English-language website; (2) sold thousands of licenses to those products to U.S. users; (3) instructed and assisted innumerable U.S. customers on how to use its products to cheat in Blizzard's games, in violation of their contracts with Blizzard; and (4) counseled those users on how to hide their conduct from Blizzard. Moreover, the relationship between Bossland and Blizzard is a parasitic one.  The Bossland products at issue are single-purpose; they work only with Blizzard's games, cannot be used without violating Blizzard's rights, and would not even exist were it not for Blizzard and its games.

And that only scratches the surface.  Blizzard's investigation reveals that Bossland's founder's sworn statement that Bossland "has ***no connection*** to California or the United States" is false or, at best, misleading.  *See* Declaration of Zwetan Letschew ("Letschew Decl."), ¶ 82, emphasis added.  Bossland has targeted the U.S. market, aimed its business at a California resident, ***and*** taken advantage of U.S. resources, laws, and services for its business.  For example, Bossland has hired U.S. counsel to obtain two U.S. trademark registrations for its software products, and it attempted to obtain a third, affirming that it intended to

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

Mitchell
Silberberg &
Knupp LLP

use those marks in U.S. commerce.  Bossland also created and sells, in the U.S. iTunes store, to U.S. consumers, for U.S. currency, two mobile apps that allow U.S. consumers to access Bossland's website and to monitor the success of Bossland products they have purchased.  Bossland also has employed the services of numerous individuals and companies in the United States, including by (1) hiring or contracting with software developers, forum administrators and other support staff; (2) using various U.S. service providers for its business, such as to host and send subscriber newsletters and to host its customer-support website and user manuals; and (3) encouraging and enabling U.S. users to build and sell on the Bossland website community-made add-ons to the Bossland software.  *See generally* Declaration of James Berkley ("Berkley Decl.") and Exhibits thereto.

Bossland deliberately omits ***all*** of the foregoing facts (and many more) from its moving papers.  Then, in a final effort to escape liability for its significant U.S. conduct, Bossland makes the outright false claim that "[t]he most efficient judicial resolution of the controversy between Blizzard and Bossland would be to let the courts in Germany resolve the claims…."  Mot. 23.  Bossland, however, fails to disclose that it argued in the German courts, and the German courts held, that the German courts' reach is ***limited to sales within Germany***.  *See* Declaration of Matthias Werner ("Werner Decl.") and Exhibits thereto.  This case is about the harm caused to Blizzard by the sale and use of Bossland's products in the ***United States***.  Blizzard is entitled to seek a remedy for that conduct in the United States (and, specifically, in California), where thousands of copies of its software products have been distributed and are regularly being used to harm Blizzard.

To defeat Bossland's Motion, Blizzard need only make a *prima facie* showing of jurisdictional facts.  It has easily met that burden.  By contrast, Bossland has not even come close to making the requisite compelling case that the exercise of jurisdiction would be unreasonable.  Bossland's Motion should be

Mitchell
Silberberg &
Knupp LLP

2

1    denied.  Alternatively, Blizzard should be permitted limited discovery to further

2    assess the broad extent of Bossland's U.S. and California presence.

3    **II.      STATEMENT OF RELEVANT FACTS**

4          **Blizzard and its Games.**  Blizzard, an Irvine, California-based company,[1] is

5    a preeminent developer and publisher of computer and video game software.

6    Blizzard's catalog includes the highly successful and widely played games "World

7    of Warcraft," "Diablo III," "Heroes of the Storm," "Hearthstone," and, most

8    recently, "Overwatch" (collectively, the "Blizzard Games").  Declaration of Clint

9    Rice ("Rice Decl."), ¶ 4.  Each of the Blizzard Games represents an enormous

10   investment of time and money.  *Id.* ¶ 5.  Thousands of individuals, primarily based

11   in California, are responsible for the creation and success of the Blizzard Games.

12   *Id.* ¶ 3.

13         The success of each of the Blizzard Games is dependent in large part on its

14   online, multiplayer experience.  Rice Decl., ¶ 6.  It is critical to Blizzard's business

15   that players are consistently engaged, and that all players have an equal chance of

16   success.  *Id.*  Accordingly, Blizzard invests millions of dollars in balancing and

17   fine-tuning its games, policing its games against cheaters and hackers, and

18   maintaining a robust set of procedures and technologies to ensure that the Blizzard

19   Games remain fun and fair for all players.  *Id.,* ¶¶ 6, 14-15.

20         To access, install, and play the Blizzard Games, a user must assent to an

21   End-User License Agreement ("EULA") for Blizzard's "battle.net" online system,

22   as well as a Terms of Use ("TOU") for each particular game.[2]  Rice Decl., ¶ 8.

23   Both the EULA and the TOU provide, as a condition to installing the game and

24   accessing Blizzard servers to play it, that the user will not "under any

---

[1] Blizzard is a subsidiary of Activision Blizzard, Inc., based in Santa Monica, California.

[2] All of the Blizzard Games are played via "battle.net."  To play any of the Blizzard Games and access Blizzard's battle.net servers, it is necessary to have a valid and active battle.net account.  *See Davidson & Associates v. Jung*, 422 F.3d 630, 633 (8th Cir. 2005).

circumstances…  Create, use, offer, advertise, make available and/or distribute" software designed to unfairly manipulate the online environment.  Rice Decl., ¶ 8, Exs. 1-2.  Blizzard employs technology (some of which is called "Warden") that is designed to detect such software and to restrict access to the Blizzard Games.  Rice Decl., ¶ 14; *see MDY Indus., LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 942 (9th Cir. 2010).  Blizzard also employs teams of individuals to police its online environment, respond to customer complaints and reports, and develop and improve detection efforts.  Rice Decl., ¶¶ 10, 14.  Blizzard can (and does) suspend or permanently disable (*i.e.*, "ban") the Blizzard accounts of players found to have violated Blizzard's terms and conditions.  *Id.*, ¶ 15.

**Bossland and its Malicious Software Products.**  Bossland is incorporated in Germany and owned by Zwetan Letschew (a/k/a "Bossland") of Zwickau, Germany, and Patrick Kirk (a/k/a "Hawker") of Reading, England.  Rice Decl., ¶ 25; Berkley Decl., ¶¶ 62, 70 and Exs. 63, 71.  It is staffed by individuals from various countries, including the United States, Sweden, and Greece.  *Id.*, ¶¶ 15-23, 53-71, 76-90 and Exs. 14-25, 55-72, 77-90; Rice Decl., ¶¶ 23-27.  Bossland develops and sells malicious software products designed to disrupt or ruin the Blizzard Games by enabling players to unfairly exploit and manipulate the game experience, including by using cheats, bots (*i.e.* software that automates gameplay to allow a player to gain a competitive advantage against others) and other software hacks.  Rice Decl., ¶¶ 10-12; Berkley Decl., ¶¶ 1-20, Exs. 1-21.

Bossland has offered at least five separate software products and services targeted at Blizzard and specifically designed and marketed to consumers as tools to disrupt and manipulate the Blizzard Games: (1) Honorbuddy (for "World of Warcraft" aka "WoW"), (2) Demonbuddy (for "Diablo III"), (3) Stormbuddy (for "Heroes of the Storm"), (4) Hearthbuddy (for "Hearthstone"), and (5) Watchover Tyrant (for "Overwatch") (collectively, the "Bossland Software").  Rice Decl., ¶ 11; *see also* Letschew Decl., ¶¶ 3-4; Berkley Decl., Exs. 1-8, 11, 18, 26.  The

Mitchell
Silberberg &
Knupp LLP

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

Bossland Software has no purpose other than to facilitate cheating in the Blizzard Games:  it cannot be used for any other company's games, and it is marketed and advertised specifically for use with the Blizzard Games.  For example, Bossland advertises HonorBuddy as "THE BOT FOR WOW" and the "Best available 3d party Bot for the game *World of Warcraft* from *Blizzard.*"  With each of its products, Bossland also offers links to Blizzard's own U.S.-based website and product pages.  Berkley Decl., ¶¶ 13-14, Exs. 11-13.

Bossland makes the Bossland Software available for download on its website.  However, the Bossland Software can only be used if the user has first purchased a license from Bossland.  *See* Letschew Decl., ¶ 21.  Bossland's most common pricing plans range from 12.95 Euros for a one month license, to 199 Euros for a one-year, full featured "premium" plan.  Berkley Decl., Exs. 1-2.  Bossland sells its licenses using California-based PayPal, and it accepts a number of credit cards.  *Id*. ¶¶ 7, 52 and Exs. 1-2, 5, 54.  When the Bossland Software is installed on a user's computer, it performs an authentication check against Bossland's server to determine whether the user has an active license.  Without an active license, the Bossland Product will not run.  *Id.* ¶ 19, Ex. 20.  Thus, each Bossland user must renew his or her license on a monthly or yearly basis.  Bossland claims that it has "over *260,000* registered users."  *Id.,* Ex. 1.  Bossland offers regular updates to its products (http://updates.buddyauth.com/) and advises its customers of the status of its products and of its servers.  *Id*. ¶¶ 8-13, Exs. 6-11.

**Bossland's Knowing and Intentional Efforts to Harm Blizzard.**  As noted, the Bossland Software is designed specifically to disrupt the Blizzard Games; it has no other purpose.  Bossland knows that using its software violates Blizzard's terms and conditions, and thus that every one of its customers engages in a contractual breach each time he or she uses the Bossland Software.  Indeed, Bossland states on its website:  "*This website is not associated with Activision Blizzard Inc. and Honorbuddy may be against their TOS* [*i.e.,* Terms of

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

Service]/*EULA.*"  Berkley Decl., Ex. 1.  Bossland also falsely tells its customers that "[b]otting is not against any law," ignoring decisions of courts in the U.S. and elsewhere.  *Id.*, Exs. 1-2.

Bossland has taken a number of steps to thwart, disrupt, and circumvent Blizzard's efforts to detect the Bossland Software.  One of these is to incorporate into the Bossland Software certain "proprietary technology" that is designed to deactivate the Bossland Software when it is at risk of being detected by Blizzard. Rice Decl., ¶ 16.  In Bossland's own words:

> Game owners employ a suite of spyware technologies built into their products to detect things they want to monitor.  For WoW, these technologies are known as "the Warden"…. Tripwire is anti-spyware technology built into Bossland GmbH products to "watch the watchers." Tripwire is always active.  It is constantly looking at [Warden].  Tripwire will automatically render all active sessions of a Buddy bot as invalid if it detects [Warden] doing anything sneaky.

Berkley Decl. ¶ 17, Ex. 16.  Bossland also tries to thwart Blizzard's detection efforts by communicating with its customers and encouraging and enabling them to communicate with each other about the most effective ways to deceive Blizzard or avoid being caught using the Bossland Software.  For example, Bossland offers an entire message board dedicated to "Ban Reports" and discussions about avoiding bans (called the "Ban Section").  Rice Decl., ¶ 17; Berkley Decl., ¶¶ 27-32, Exs. 28-33.  Some of the most prominent posts on the Ban Section are titled "Avoiding the BANHAMMER" and "How to keep your Account more safe (Anti-Ban)."  *Id.* These posts offer tips about how to avoid being noticed by Blizzard and other players.  Bossland also encourages users to post each time they are banned, so that other users can learn from them and avoid their own bans.  *Id.*, Ex. 28.  In these ways, Bossland not only actively and directly exhorts and encourages its users to breach Blizzard's terms and conditions, but it also assists those users in concealing

Mitchell
Silberberg &
Knupp LLP

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

their breaches in order to receive the **benefits** of the EULA and TOU (*i.e.* access to Blizzard's servers and the ability to play its games.).  *See, e.g., id.*, Exs. 16, 18, 28-33.

Each time Bossland distributes a copy of the Bossland Software into the United States, it violates Section 1201(a)(2) of the DMCA.  *See MDY,* 629 F.3d at 954.  Also, each time a Bossland customer uses the Bossland Software, he or she breaches the EULA and TOU.  *See Blizzard Entertainment, Inc .v. Ceiling Fan Software LLC,* 28 F. Supp. 3d 1006, 1011 (C.D. Cal. 2013) (Selna, J.).  As a result, over the past four years, Bossland has knowingly engaged in thousands of separate violations of the DMCA and has intentionally facilitated and induced an equal number of breaches by persons in the United States of their contracts with Blizzard.  Rice Decl., ¶ 19

**Bossland's California and U.S. Sales Efforts.**  Bossland admits it has sold its products to thousands of U.S. customers, and that its U.S. sales have represented a large percentage of its monthly revenue (often between 20 and 30 percent).  Letschew Decl., ¶¶ 44-79.  Bossland has ongoing relationships with these customers, who must renew their licenses every month or year.  *See id.* ¶ 21; Berkley Decl., Ex. 20.  The significant number of U.S. users is confirmed by Blizzard's own research, which reflects that nearly 100,000 United States-based Blizzard accounts and/or game licenses have been suspended or banned as a result of the use of Bossland's Software.  Rice Decl., ¶ 19.

Bossland engages in extensive and deliberate efforts to market and sell its products to customers in the United States (including in California).  Bossland effectively admitted as much when, using U.S. counsel, it registered **United States trademarks** for HONORBUDDY and DEMONBUDDY, and applied for a U.S. trademark registration for HEARTHBUDDY, attesting to its entitlement and intent to use these marks in commerce **in the United States** for, among other things, "[c]omputer game and video game software."  Berkley Decl., ¶¶ 33-36 and Exs.

34-36.  Bossland's knowing, intentional exploitation of the U.S. market for its products is further confirmed by the following:

●     Bossland encourages and helps U.S. consumers to purchase its products by, for example, depicting the United States flag on its websites, providing English-language user manuals, and ensuring that the English version of its website is "usually the most current."  Letschew Decl., ¶ 15; Berkley Decl., ¶¶ 37-42, Exs. 37-43.  Bossland also provides live status updates concerning its services and servers for the "Americas" so that its U.S. customers know whether there will be any problem running the Bossland Software.  *Id.* ¶¶ 11-12, Exs. 9-11.

●     Bossland has developed and currently offers at least two Blizzard-related mobile apps in the U.S. iTunes Store:  (1) the "Buddy Forum App," which allows U.S. users to quickly and easily access the Bossland forums on their mobile devices, and (2) the "DemonBuddy App" (sold for $0.99), which enables users of DemonBuddy to track their bots' progress in Diablo.  *Id.*, ¶¶ 44-45, Exs. 45-46.

●     Bossland regularly communicates with U.S. users, telling them just last month:  "Congratulations to your new president."  *Id.*, Ex. 48.  Bossland apparently sends its U.S. users regular updates and emails in the form of "newsletters."  Letschew Decl., ¶ 15; Berkley Decl., Ex. 49.  These emails are managed and hosted on U.S. servers using the U.S. direct mail distributor "MailChimp."  *Id.* at ¶¶ 48-51, Exs. 49-53.

●     Bossland knowingly encourages U.S. users to participate in its online forums, to both provide and receive advice concerning the Bossland Software.  Among the most prominent Bossland forum posters is "KickAzz" (Scott Baker of Texas, further discussed below).  Bossland's customers also routinely identify themselves on Bossland's website as living in the United States and playing the Blizzard Games on U.S. servers.  *Id.*, ¶¶ 24-26 and Exs. 26-27, 55-56, 67-70.

**Bossland's U.S.-Based Contracts.**  In addition to its licenses with U.S. customers, Bossland employs and contracts with individuals and entities in

California and elsewhere in the U.S.  At least two Bossland employees or independent contractors are located in California:  (1) Nathan Bolesworth of Apple Valley, California, a "C# Application Developer" for Bossland GmbH; and (2) Matthew Ritter, a "Lead Narrative Designer" for Bossland GmbH and its affiliate Epic Devs.  Berkley Decl., ¶¶ 56-60, Exs. 58-62.  Another Californian, known as "la7eralus," of Tracy, California, had an as-yet-unknown role in the development of DemonBuddy, for which Bossland gave him "Special Thanks" in the DemonBuddy user manual.  *Id.,* ¶¶ 40-41,  Exs. 41-42.

Further, several people who Bossland identifies as part of the "Buddy Team," and who have high-level roles and administrative privileges at Bossland, reside in the United States.  These include: (1) "Apoc" (James Enright of New Jersey), an "at large" developer for the Honorbuddy "core" who also "frequently answers esoteric questions from the community"; (2) "ChinaJade" (Mark R. Peters of Texas), who stated in 2014 that "[a]fter three years of volunteer Community development and support, I finally accepted a position with Bossland GmbH" and that "[m]y current goal is to write… necessary code [for] Honorbuddy"; and (3) "KickAzz" (Scott Baker of Texas), who "is most well-known for the outstanding Questing profiles he makes available from Bossland GmbH," "pushes the limits of what is possible to do with Honorbuddy," and "is always ready with a handy answer to questions for the forum."  Berkley Decl., ¶¶ 15-23, 61-69 and Exs. 14-25, 63-70; *see also* Rice Decl., ¶ 24.

Bossland also maintains a network of "Community Developers" and "Buddy Store Developers," with whom it enters into contracts that allow them to create and offer for sale on the Bossland website products designed to augment the Bossland Software.  Several of these "Developers" identify themselves or are identified by Bossland as being located in the U.S.  Berkley Decl., ¶¶ 72-84, Exs 73-85; *see also* Ex. 55 at pgs. 303-308.  These include "Echo" Merrill (a/k/a "EchoTiger"), "HeisenFiles," "TheBrodieMan," "y2crazy," and "hydroxsys."  *Id.*

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

Finally, Bossland contracts with a variety of U.S.-based companies to provide services necessary to its business and technical operations.  These include (1) the Ohio law firm Pearne & Gordon LLP, which Bossland "works with" to enforce its Community Developer contracts and register its U.S. trademarks; (2) Zendesk (based in California), which manages and hosts Bossland's online customer support function; (3) Mailchimp, which manages and hosts its subscriber newsletters; and (4) Assembla, which manages coding tasks relating to the Bossland Software. *Id.* ¶¶ 38-40, 42-43, 75, 85-90 and Exs. 34-36, 39-41, 43-44, 75, 86-90.

**The German Lawsuits.**  Blizzard and Bossland have been engaged in litigation in Germany for many years.  *See generally* Werner Decl.  Bossland currently is subject to injunction orders in Germany (*Id.*, ¶¶ 4-5, 11), but has continued to sell its products elsewhere, claiming they are lawful or are unlawful "only in Germany."  Berkley Decl., Exs. 1-2; Werner Decl., ¶¶ 7, 9, Exs. 1-5. Bossland has taken the position in numerous court filings that the orders by German courts do not apply to its activities in the United States, a position with which the German courts concur.  Werner Decl., ¶¶ 7, 9-10 and Exs. 1-6.  Because this lawsuit exclusively concerns the use of Bossland's software by users located in the ***United States***, the issues in this lawsuit cannot be addressed ***at all***, let alone "most efficiently," by the German courts (Mot. at 23).

## III.   THIS COURT HAS SPECIFIC PERSONAL JURISDICTION

### A.   The Legal Standard and Burden of Proof.

Blizzard agrees, for purposes of this Motion, that the relevant inquiry is whether the Court has specific (not general) jurisdiction over Bossland, and that the Ninth Circuit's three-prong test for specific jurisdiction is set forth in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) and

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015); Mot. 10.[3]  Blizzard also agrees that the appropriate inquiry for purposes of the test's first prong is whether Bossland "purposefully directed" its activities at the forum, which is the test most commonly applied in intellectual property and tort cases.  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011); *see* Mot. 14.  And Blizzard agrees that the test for "purposeful direction" is the tripartite "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984), which "requires that the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Mavrix,* 647 F.3d at 1228 (internal citations and quotation marks omitted).  *See* Mot. 14-15.

Blizzard strongly disagrees, however, with Bossland's assertion that Blizzard's burden in opposing Bossland's motion is "heavy."  Mot. 6.  Precisely the opposite is true.

> Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts .…  In such cases, we only inquire into whether [the plaintiff's] pleadings and affidavits make a *prima facie* showing of personal jurisdiction.…  Although the plaintiff cannot simply rest on the bare allegations of its complaint, … uncontroverted allegations in the complaint must be taken as true.  Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.

*Schwarzenegger*, 374 F.3d at 800 (internal citations and quotation marks omitted).  Indeed, the single case Bossland cites on this point, *Boschetto v. Hansing*, 539 F.3d

---

[3] The three prongs are: (1) whether the defendant (a) purposefully directed his activities at the forum or (b) purposefully availed himself of the privilege of conducting activities in the forum; (2) whether the claim arises out of or relates to the defendant's forum-related activities; and (3) whether the exercise of jurisdiction is reasonable.

Mitchell Silberberg & Knupp LLP

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

1011 (9th Cir. 2008), not only does *not* state that the plaintiff's burden is "heavy," but its description of that burden is practically identical to the above-quoted language from *Schwarzenegger*.  *Compare Bocshetto*, 539 F.3d at 1015.  What *Boschetto does* say, however, is that once the plaintiff satisfies its light burden of proving the first two prongs of the tripartite test for specific jurisdiction, the burden shifts to the defendant to present a "'***compelling case***' that the exercise of jurisdiction would be unreasonable."  *Id.* at 1016; *accord, Schwarzenegger,* 374 F.3d at 802; *Picot,* 780 F. 3d at 1211.  The "heavy burden" thus lies with Bossland.

### B.   Bossland Purposefully Directed its Activities at the Forum.

#### 1.   The Relevant Forum is the United States, but Bossland is Subject to Jurisdiction even if the Forum is California.

Preliminarily, the relevant forum for jurisdictional purposes is the ***United States*** (although Bossland would be subject to specific personal jurisdiction even if the forum were limited to California).  That is because this Court has personal jurisdiction over Bossland under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2), which provides:

> For a claim that arises under federal law, serving a summons … establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Ninth Circuit courts use a tripartite test to analyze the applicability of Rule 4(k)(2): "First, the claim against the defendant must arise under federal law.  Second, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction.  Third, the federal court's exercise of personal jurisdiction must comport with due process."  *Monster Cable Prods. v. Euroflex S.R.L.*, 642 F. Supp. 2d 1001, 1008 (N.D. Cal. 2009) (internal citations and quotation marks omitted).  All three prongs are satisfied here.

Blizzard has alleged federal claims (Trafficking in Circumvention Devices in Violation of the DMCA, Inducement to Infringe Copyright, and Contributory and Vicarious Copyright Infringement).  The Court has jurisdiction over Blizzard's claims under California law (*i.e.*, Intentional Interference with Contractual Relations and Unfair Competition) because they arise from the same common nucleus of operative facts as the federal claims – *i.e.,* Bossland's creation and distribution of malicious software products that are designed to enable their users to cheat at Blizzard Games. *See Apollo Educ. Grp., Inc. v. Somani*, 2015 U.S. Dist. LEXIS 107439, at *4-5 (N.D. Cal. Aug. 13, 2015) (exercising Rule 4(k)(2) jurisdiction over federal and state claims: "[u]nder the doctrine of pendent personal jurisdiction, the court may also exercise jurisdiction over the balance of [plaintiff's] claims, which arise out of a common nucleus of operative facts") (internal citations and quotation marks omitted).

The second prong of the Rule 4(k)(2) test also is satisfied.  A plaintiff is not required to establish the *lack* of jurisdiction over a defendant in every state; rather "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed." *Goes Int'l, AB v. Dodur Ltd.*, 2015 U.S. Dist. LEXIS 113365, at *21 (N.D. Cal. Aug. 26, 2015) (internal citations and quotation marks omitted).  Bossland has not done so.  To the contrary, Bossland contends that jurisdiction does not exist anywhere in the United States. *See* Letschew Decl., ¶¶ 7-39, 82.

The final part of the Rule 4(k)(2) analysis is identical to the Ninth Circuit's test for specific jurisdiction in California, except that "rather than considering contacts between the [defendant] and the forum state, we consider contacts with the nation as a whole." *AMA Multimedia LLC v. Sagan Ltd.*, 2016 U.S. Dist. LEXIS 141934, at *6 (D. Ariz. Oct. 13, 2016) (internal citations and quotation marks omitted).  As set forth below, Blizzard has made far more than the requisite *prima facie* showing that Bossland has sufficient contacts both with the United

Mitchell
Silberberg &
Knupp LLP

13

1  States as a whole and with California in particular.  Viewed through either lens,

2  personal jurisdiction plainly exists in this Court.

### 2.    Bossland Does Not Challenge the Existence of the First and Third Prongs of the Effects Test.

5  Bossland does not dispute that two prongs of the effects test are satisfied

6  here (intentional acts, and causing foreseeable harm in the forum).  *See* Mot. 15-19.

7  "[S]imply creating and registering a website, even a passive one, qualifies as an

8  intentional act."  *Circle Click Media LLC v. Regus Mgmt. Group LLC*, 2014 U.S.

9  Dist. LEXIS 146408, at *15 (N.D. Cal. Oct. 14, 2014); *see also AMA Multimedia*,

10  2016 U.S. Dist. LEXIS 141934, at *9 (where defendant was the owner/operator of

11  website, "the Court finds that [defendant] engaged in an intentional act.").

12  Bossland has done that and more:  It has licensed its malicious software to, and

13  received payment from, thousands of U.S. users.  It has knowingly distributed

14  thousands of circumvention devices into the U.S.  It regularly communicates with

15  U.S. customers and instructs them how to breach their contracts with Blizzard.

16  Distribution of the Bossland Software also indisputably harms Blizzard in

17  the United States, and specifically in California, where Blizzard is located.  "A

18  corporation incurs economic loss, for jurisdictional purposes, in the forum of its

19  principal place of business."  *CollegeSource, Inc. v. AcademyOne, Inc.,* 653 F.3d

20  1066, 1079 (9th Cir. 2011).  *See also Mountz v. Northeast Indus. Bolting &*

21  *Torque, LLC*, 2016 U.S. Dist. LEXIS 157275, *14-15 (N.D. Cal. Sept. 30, 2016)

22  ("Where, as here, a party brings a claim for infringement of intellectual property,

23  [i]t is foreseeable that the loss will be inflicted both in the forum where the

24  infringement took place . . . and where the copyright holder has its principal place

25  of business.") (internal citations and quotation marks omitted).

26  Unable to challenge these two parts of the effects test, Bossland focuses

27  entirely on the third, arguing that it did not "expressly aim" its intentional acts at

28  California or the United States.  Bossland's argument does not withstand scrutiny.

Mitchell
Silberberg &
Knupp LLP

14

### 3. Bossland Expressly Aimed Intentional Acts at the United States and at California.

Where, as here, the defendant operates a website, courts analyze "intentional aiming" by examining the interactivity of the website plus the defendant's other conduct directed toward the forum.  As the Ninth Circuit explained:

> [W]e have held that operating even a passive website in conjunction with "something more" – conduct directly targeting the forum – is sufficient….  In determining whether a nonresident defendant has done "something more," we have considered several factors, including the interactivity of the defendant's website … the geographic scope of the defendant's commercial ambitions … and whether the defendant "individually targeted" a plaintiff known to be a forum resident.

*Mavrix*, 647 F.3d at 1229 (collecting cases; internal citations omitted). "Additionally, the forum state has jurisdiction over a defendant who continuously and deliberately exploited the market in the forum state through a website." *Circle Click Media*, 2014 U.S. Dist. LEXIS 146408, at *16 (internal citations and quotation marks omitted).

Bossland operates a highly interactive, commercial website.  Bossland's website allows visitors in the United States to purchase renewable licenses to use the Bossland Software, to then download both the Software and English-language "user manuals" for that Software, and to sign up for Bossland's newsletter, which is managed and hosted on servers located in the United States.  Berkley Decl., Exs. 1-8, 20, 49-52.  As part of its website, Bossland also provides ongoing support, advice, and guidance about the Bossland Software by maintaining online "Buddy Forums," encouraging its users (including U.S. users) to regularly visit and post in the Buddy Forums, and hiring or recruiting individuals (including those, such as KickAzz and Chinajade, located in the United States) to administer the Forums and communicate directly with users.  *See, e.g., id.*, Exs. 15, 18-19, 26-32, 39, 55, 63,

67-70.  The interactivity and commercial nature of the Bossland website weigh heavily in favor of personal jurisdiction.  *See Jeske v. Fenmore*, 2008 U.S. Dist. LEXIS 100409, at * 11 (C.D. Cal. Dec. 1, 2008) (Carter, J.) ("[A] highly interactive website is one that allows the defendant to enter into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet.") (internal citations and quotation marks omitted); *Stomp, Inc. v. Neato*, 61 F. Supp. 2d 1074, 1078 (C.D. Cal. 1999) (Carter, J.) (finding that defendant's website was "highly commercial," giving rise to personal jurisdiction:  "Although [defendant's] website provides information about the company, customer service, and technical support, a substantial portion of the site is dedicated to allowing the consumer to purchase [defendant's] products online.").

Further, and notwithstanding Bossland's assertions to the contrary, its websites and overall business ***do*** target U.S. consumers and exploit the U.S. market.  The sites are available in English, and their pages depict the U.S. flag.  Berkley Decl., Exs. 1-2, 26, 37-38.  Bossland's co-Managing Director, Zwetan Letschew, has even directly addressed U.S. customers in his blog, which is part of the Bossland corporate site.  *Id.*, Exs. 47-48.  Moreover, represented by a law firm in Ohio, Bossland registered U.S. trademarks for DemonBuddy and HonorBuddy, and applied for a trademark registration for HearthBuddy, attesting it was entitled to and intended ***to use these marks in commerce in the U.S.***[4]  *Id.*, Exs. 34-36.

Perhaps most critically, Bossland's own evidence demonstrates that a significant portion of its revenue is derived from U.S. purchases.  For example, Letschew admits that in July 2013, U.S. purchases accounted for 28.73% of Bossland's total revenue for the month.  Letschew Decl., ¶ 44.  The figures for

---

[4] Bossland's trademark registrations also belie its claim that it does not own property in the United States (Mot. 12). "A trademark is, of course, a form of business property."  *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir. 1980).

Mitchell
Silberberg &
Knupp LLP

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

subsequent months are similar.  *See generally* Letschew Decl.; *see also AMA Multimedia*, 2016 U.S. Dist. LEXIS 141934, at *11 (finding specific personal jurisdiction under Rule 4(k)(2) where "[plaintiff] alleges that in the past 6 months, United States residents were the largest source of [defendant's website's users], comprising 23.26% of … viewers.").  Even for those 10 months in 2015 and 2016 where Bossland purports to break out purchases of the specific products at issue in this litigation, those products, on the average, accounted for 11.48% of Bossland's monthly revenue.[5]  Letschew Decl., ¶¶ 65-71, 75-79.  Bossland's substantial U.S. user base further is confirmed by the large number of U.S.-region accounts that have been banned or suspended from Blizzard's system for cheating using the Bossland Software.  Rice Decl., ¶ 19.

Evidence of Bossland's "express aiming" is not limited to its interactive website and its sales to U.S. consumers.  Bossland has hired at least two Californians, as well as several U.S. residents, as part of its "Buddy Team."  Berkley Decl., ¶¶ 15-23, 56-69 and Exs. 15, 58-70.  It has entered into contracts for the creation of products designed to augment or work in conjunction with the Bossland Software with multiple "Community Developers" and "Buddy Store Developers."  *Id.*, ¶¶ 72-84 and Exs. 73-85; *see also* Ex. 55 at pgs. 303-308.  Bossland offers, in the U.S. iTunes store, two mobile apps related to the Bossland Software, one of which is free and allows U.S. users to quickly access the Bossland forums on their mobile devices, and the other of which is sold for $0.99 and allows U.S. users of DemonBuddy to track the progress of the bots they are (unlawfully) running in Blizzard's Diablo game.  *Id.*, ¶¶ 44-45 and Exs. 45-46.

---

[5] Since Bossland has produced neither the purchase information it purportedly received from its third-party payment processor, not divulged the amount and source of the revenue it received in any month, the Court is left only with Mr. Letschew's assertions about the numbers of U.S. purchases and what percentage of monthly revenue those purchases represent.

Mitchell
Silberberg &
Knupp LLP

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

1    Not only does this mountain of evidence represent far more than the

2    requisite *prima facie* showing of "express aiming" at the United States (and

3    California), but the evidence also clearly shows that Bossland "individually

4    targeted" Blizzard itself, which it knows to be a California resident.  *Mavrix,* 647

5    F.3d at 1229.  The Bossland Software can be used ***only*** in conjunction with

6    Blizzard Games; it has no other function.  Without Blizzard, the Bossland Software

7    could not exist, and its sole purpose violates Blizzard's intellectual property rights

8    and terms and conditions, as Bossland well knows.  *See, e.g.,* Berkley Decl., Ex. 2

9    (webpage for DemonBuddy: "This website is not associated with Activision

10   Blizzard Inc. and Demonbuddy may be against their TOS/EULA").  Blizzard is a

11   resident of the United States, with servers located in California and Illinois.  Rice

12   Decl., ¶ 8.  "[T]he Ninth Circuit has held that specific jurisdiction exists where a

13   plaintiff … alleges that defendant intentionally infringed its intellectual property

14   rights knowing [the plaintiff] was located in the forum state.'"  *Cal Brewing Co. v.*

15   *3 Daughters Brewing LLC*, 2016 U.S. Dist. Lexis 52344, at *8 (E.D. Cal. April 18,

16   2016).  Bossland is fully aware of Blizzard's location.  *See* Berkley Decl., Exs 12-

17   13; Werner Decl., Ex. 6.

18       Bossland overstates the Supreme Court's recent decision in *Walden v. Fiore*,

19   134 S. Ct. 1115 (U.S. 2014).  *Walden* in no way changes the result here.  As a

20   threshold matter, *Walden* did not deal with torts committed online.  Indeed, the

21   Court made clear that "this case does not present the very different questions

22   whether and how a defendant's virtual 'presence' and conduct translate into

23   'contacts' with a particular State."  *Id.* at 1125, n.9.  A number of district courts in

24   this Circuit thus have recognized that *Walden* does not apply to interactive

25   websites, and the Ninth Circuit has not ruled on the issue.  *See, e.g., LiveCareer*

26   *Ltd. v. Su Jia Techs. Ltd.,*  2015 U.S. Dist. LEXIS 43287, at *12 (N.D. Cal. March

27   31, 2015) ("*Walden* does not address whether and how a defendant's virtual

28   presence and conduct translate into contacts with a particular State, and therefore

Mitchell
Silberberg &
Knupp LLP

18

1    does not change the analysis of [defendant's] interactive website.") (internal

2    citations and quotation marks omitted); *AMA Multimedia*, 2016 U.S. Dist. LEXIS

3    141934, at *13 ("*Walden* did not deal with the question of how contacts through

4    the internet affect minimum contacts analysis.").

5         *Walden* at most **clarified** the standard for specific personal jurisdiction; it did

6    not change it.[6]   The Court merely reiterated the long-standing, unremarkable

7    proposition that "[t]he proper focus of the 'minimum contacts' inquiry in

8    intentional-tort cases is 'the relationship among the defendant, the forum, and the

9    litigation.'"   134 S. Ct. at 1126 (*citing Calder*, 465 U.S. at 788).   Applying these

10   principles post-*Walden*, district courts repeatedly have found personal jurisdiction

11   over defendants who engaged in interactive online activity similar to Bossland's,

12   but with far less evidence of express aiming than exists here.   *Microsoft Corp. v.*

13   *Mt. West Computers, Inc.*, 2015 U.S. Dist. LEXIS 95663 (W.D. Wash. July 22,

14   2015), cited by Bossland, is but one example.   There, Microsoft sued a Utah-based

15   IT services company and its principals for copyright and trademark infringement.

16   Defendants did not conduct any advertising or marketing outside of Utah and were

17   unaware of ever having provided any service or making any sale to a Washington

18   business or resident.   *Id.* at *3.   Nevertheless, the court found specific personal

19   jurisdiction because Defendants had contacted Microsoft by telephone and by

20   internet communication with Microsoft servers to validate copies of the software

21   they were installing:   "Regardless of whether Defendants knew where Plaintiff's

22

23   [6] Bossland claims in a footnote that numerous courts in this Circuit have
     "recognized" that *Walden* overruled *Washington Shoe Co. v. A-Z Sporting Goods*
24   *Inc.*, 704 F.3d 668 (9th Cir. 2012), but this is an overstatement.   (Mot. 15, n. 3.)
     Many post-*Walden* district court cases have continued to rely on *Washington Shoe*.
25   *See, e.g., AMA Multimedia*, 2016 U.S. Dist. LEXIS 141934 at *9, 13; *LiveCareer*,
     2015 U.S. Dist. LEXIS 43287 at *9, 21-22; *Cal Brewing*, 2016 U.S. Dist. LEXIS
26   52344, at *7.   Further, the Ninth Circuit, confronted with the opportunity to state
     that *Washington Shoe* is no longer good law, did not do so, instead opining that
27   *Walden* had simply "reinforced" the "traditional understanding" that personal
     jurisdiction focuses on the defendant's contacts with the forum state, not simply
28   with the forum resident.   *See Picot*, 780 F.3d at 1214.

Mitchell
Silberberg &
Knupp LLP

19

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

servers were located, Defendants admit that they knew Microsoft is located in Washington.  Even though Defendants' contacts with Plaintiff were made remotely, they knew Plaintiff to be located in and operating out of the State of Washington."  *Id.* at *17.

*Cal Brewing Co.*, another post-*Walden* case, also is instructive.  There, a California beer brewer sued a Florida competitor for trademark infringement.  The Florida company sold beer throughout the country, including in California, using national retailers and social media marketing.  Citing *Schwarzenegger*, the court explained that "'[t]he 'express aiming' analysis depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue.'"  2016 U.S. Dist. LEXIS 52344, at *12.  The court reasoned that trademark infringement was more analogous to the libel claim in *Calder* than to the seizure of cash from a Nevada resident at an airport in Georgia that was at issue in *Walden*, because both libel and trademark infringement require publication to third persons, which connects the tort to the forum state.  The *Cal Brewing* court thus concluded that, unlike *Walden*, "[s]pecific jurisdiction over [defendant] is not based on random, fortuitous or attenuated contacts defendants made with [plaintiff] …, but rather on defendants' alleged conduct in marketing and selling an infringing product to California consumers with an alleged intent to directly compete with [plaintiff]."  *Id.* (internal citations and quotations omitted).

Here, as in *Cal Brewing*, the copyright infringement, wrongful circumvention and related torts alleged are far more analogous to *Calder* than to *Walden* because jurisdiction is not based on random, fortuitous contacts by Bossland with Blizzard, but rather on Bossland's marketing, selling, encouraging and assisting U.S. customers to use unlawful software that has no purpose whatsoever other than to violate Blizzard's contracts and intellectual property rights.  In the Supreme Court's words, there is a clear "'relationship among the defendant, the forum, and the litigation.'"  *Walden,* 134 S. Ct. at 1126 (*quoting*

Mitchell
Silberberg &
Knupp LLP

20

1     *Calder*, 465 U.S., at 788).

2             **4.     Blizzard's Claims Arise out of Bossland's U.S. Activity.**

3         For this prong of the jurisdictional analysis, the Ninth Circuit applies a "but

4 for" test, which requires the plaintiff to demonstrate that its claims would not have

5 occurred but for defendant's contacts with the forum state. *Ballard v. Savage*, 65

6 F.3d 1495, 1500 (9th Cir. 1995). That test is easily met here. This case is about

7 Bossland's violation of Blizzard's rights ***within the United States***, which ***could not***

8 have occurred but for Bossland's distribution of the Bossland Software to users

9 within the United States. *See, e.g., AMA Multimedia*, 2016 U.S. Dist. LEXIS

10 141934, at *17 (Rule 4(k)(2) "but for" test satisfied because: "[Plaintiff] has

11 alleged substantial contacts between [defendant's website] and the United States,

12 showing that [defendant's website] anticipated, desired and achieved a substantial

13 United States viewer base with the intent of commercial gain. [The website's]

14 alleged infringement of [plaintiff's] copyrighted works would serve only to further

15 the purpose of growing the United States viewership for commercial gain. What is

16 more, [defendant's website] specifically targeted [plaintiff's] content, knowing

17 [plaintiff] was a United States company protected by United States copyright laws,

18 and proceeded to post that content in the United States, where [plaintiff] is

19 attempting to make business use of its copyrighted material.").

20             **5.     The Exercise of Jurisdiction is Reasonable.**

21         Bossland has not carried its heavy burden of showing that the exercise of

22 jurisdiction would be unreasonable. "[I]t is not enough that the [defendant]

23 demonstrate that some other forum is more reasonable than California, [defendant]

24 must show a due process violation; [defendant] must show that jurisdiction in

25 California would make the litigation so gravely difficult and inconvenient that a

26 party unfairly is at a severe disadvantage in comparison to [its] opponent." *See*

27 *Jeske*, 2008 U.S. Dist. LEXIS 100409, at *16-17 (internal citations and quotation

28 marks omitted). The Ninth Circuit considers seven factors in determining

1   reasonableness, which are listed in Bossland's motion.  Mot. 20-21; *see also Rio*

2   *Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002) (listing factors).

3   Not one of them weighs against the exercise of jurisdiction over Bossland.

4   　　　　**(i)**　　　　**The Extent of Purposeful Interjection**.  As discussed above,

5   Bossland expressly aimed its conduct at U.S. customers, deriving significant

6   percentages of its revenue from U.S. sales, offering apps related to the Bossland

7   Software in the U.S. iTunes store, and even requesting and/or obtaining U.S.

8   trademarks for three of its products at issue here, attesting that it intended to use

9   those marks in *United States commerce*.  Since the Bossland Software has no

10  purpose or functionality other than to manipulate Blizzard's Games, it is

11  indisputable that Bossland intentionally targeted Blizzard, a U.S. company

12  headquartered in California.  *See AMA Multimedia*, 2016 U.S. Dist. LEXIS

13  141934, at *19 (first factor favored jurisdiction where defendant's website targeted

14  the U.S. market for commercial gain).

15  　　　　**(ii)**　　　　**The Burden of Defending in the Forum.**  Bossland has grossly

16  exaggerated its vague arguments about the burden of defending this case in the

17  United States.  (Letschew Decl., ¶ 84; Mot. 21-22.)  Preliminarily, Bossland's

18  arguments are premised entirely on the suggestion that Mr. Letschew would be

19  required to be physically in California to "manage the litigation."  Mot. 22.  That

20  assertion defies credibility in this age of electronic communications, document

21  storage, and discovery.  At most, Letschew might have to be in California for a few

22  days *if* this case were not resolved by summary judgment and proceeded to trial.

23  Further, Letschew's claims that he alone "manage[s] the daily operations of

24  Bossland" and that he is "solely responsible for Bossland's accounting" are devoid

25  of any description of what "managing the daily operations" entails, what

26  "Bossland's accounting" means or involves, and why these tasks cannot be

27  performed remotely by computer anywhere in the world, if Letschew should have

28  to spend a few day in California during trial.  Letschew's "I alone" arguments also

1   are exceedingly suspect, given his admission that he is one of *two* Managing

2   Directors of the company, and that a Managing Director is similar to a Chief

3   Executive Officer.  Letschew Decl., ¶ 1.  Letschew does not claim that his co-

4   CEO/Managing Director would be incapable of running the company in

5   Letschew's theoretical "absence."

6      **(iii)    The Extent of Conflict With the Sovereignty of the Defendant's**

7   **State.**  Contrary to Bossland's claims, there is no conflict with the sovereignty of

8   Germany (Mot. 22-23) because Blizzard's complaint addresses Bossland's

9   violations of Blizzard's rights in the United States.  *See, e.g.,* Complaint ¶ 3

10   ("Defendants' sale and distribution of the Bossland Hacks *in the United States* has

11   caused Blizzard to lose millions or tens of millions of dollars in revenue, and to

12   suffer irreparable damage to its goodwill and reputation.") (emphasis added);

13   Complaint, Prayer for Relief ¶ 1 (seeking injunction limited to the United States).

14   *See LiveCareer*, 2015 U.S. Dist. LEXIS 43287, at *26 ("Here, although Cyprus has

15   some interest in regulating the conduct of its corporations, [plaintiff's] complaint

16   only raises questions of U.S. law.") (internal citations omitted).

17      Bossland blatantly misleads this Court by arguing that a conflict exists

18   because Blizzard and Bossland are engaged in litigation in Germany.  The German

19   litigation, and the injunctions issued by the German court, are specifically limited

20   to Bossland's distribution of DemonBuddy and Watchover Tyrant *in Germany*.  In

21   the German litigation, Bossland repeatedly argued that any injunctive or other

22   relief issued by the German court could *only* apply to distribution of the Bossland

23   Software within Germany, and the German court agreed.  Werner Decl., ¶¶ 7, 9-10,

24   Exs. 1-6.  Having made those express representations, Bossland now is judicially

25   estopped from claiming a purported conflict with the German courts (Mot. 23).

26   *See Rapture Shipping Ltd. v. Allaround Fuel Trading B.V.*, 350 F. Supp. 2d 369,

27   373-75 (S.D.N.Y. 2004) (judicial estoppel based on position taken in court in the

28   Netherlands).

1   **(iv)   The Forum State's Interest in Adjudicating the Dispute.**  "The

2   United States has a significant interest in resolving disputes of United States

3   copyright law involving infringement by foreign defendants."  *AMA Multimedia*,

4   2016 U.S. Dist. LEXIS 141934, at *21.  Moreover, the United States (and the

5   Central District of California in particular) has an interest in protecting the rights of

6   its resident, Blizzard.

7   **(v)   The Most Efficient Judicial Resolution of the Controversy.**

8   Purporting to address judicial economy, Bossland again disingenuously points to

9   the German litigation.  (Mot. 23.)  As discussed above, the German courts cannot

10  decide the legality of Bossland's infringement of Blizzard's rights in the United

11  States.  Blizzard filed suit in the United States precisely because it could not obtain

12  relief in Germany.

13  **(vi)   The Importance of the Forum to the Plaintiff's Interest in**

14  **Convenient and Effective Relief.**  As discussed above, Blizzard can only obtain

15  relief for its U.S. claims against Bossland in the United States, and Blizzard is

16  based in the Central District of California.

17  **(vii)   The Existence of an Alternative Forum.**  There is no alternative

18  forum.  As discussed above, litigation in Germany cannot reach Blizzard's United

19  States claims, and Bossland has identified no alternate forum state within the U.S.

20  **IV.   ALTERNATIVELY, BLIZZARD IS ENTITLED TO DISCOVERY**

21  Even without the benefit of formal discovery, which Bossland refused to

22  allow,[7] Blizzard has satisfied its burden of making a *prima facie* showing of

23  personal jurisdiction.  However, if the Court determines that Blizzard has not

24  presented enough evidence to make that *prima facie* showing, Blizzard hereby

25  requests that the hearing on this motion be continued, and that Blizzard be

26  permitted to take jurisdictional discovery.  Courts have broad discretion to

27  _____

[7] During the parties' pre-filing conference, Bossland refused to agree to
28  jurisdictional discovery, or to a briefing schedule that would allow time for it.

authorize jurisdictional discovery upon a "colorable showing" that personal jurisdiction exists.  *See eMag Sols., LLC v. Toda Kogyo Corp.*, 2006 U.S. Dist. LEXIS 94462, at *10 (N.D. Cal. Dec. 21, 2006) ("[A] plaintiff is not obligated to make out a 'prima facie' case of personal jurisdiction before it can obtain limited jurisdictional discovery, because '[i]t would … be counterintuitive to require a plaintiff, prior to conducting discovery, to meet the same burden that would be required to defeat a motion to dismiss.'"); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977) (jurisdictional discovery may be allowed where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary). Courts may continue the hearing date on a motion to dismiss to permit jurisdictional discovery.  *See Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 672-73 (S.D. Cal. 2001).

Should this Court decide that additional factual development is required to decide the issue of personal jurisdiction, Blizzard would request limited party and third-party discovery into facts such as (1) the percentage of Bossland's transactions with U.S. customers as compared to customers in other countries; (2) the percentage of Bossland's sales of Blizzard-directed products as compared to other products in its portfolio; (3) Bossland's contracts with service providers and vendors such as Apple's iTunes Store, Mailchimp, Zendesk, PayPal, and others; (4) Bossland's relationships with its U.S.-based developers, forum administrators, and support staff; (5) Bossland's "Developer" program, including the number of U.S.-based developers, and (6) Bossland's pursuit and registration of U.S. trademarks and the facts supporting its claims before the U.S. Patent and Trademark Office.

## V.    CONCLUSION

For the foregoing reasons, Bossland's Motion should be denied.

Mitchell Silberberg & Knupp LLP

**BLIZZARD'S OPPOSITION TO MOTION TO DISMISS**

1    DATED: December 12, 2016          KARIN G. PAGNANELLI
                                       MARC E. MAYER
2                                      EMILY F. EVITT
                                       DANIEL A. KOHLER
3                                      MITCHELL SILBERBERG & KNUPP LLP

4

5                                      By:   /s/ Marc E. Mayer

6                                            Marc E. Mayer
                                             Attorneys for Plaintiff
7                                            Blizzard Entertainment, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28