KARIN G. PAGNANELLI (SBN 174763)
    kgp@msk.com
MARC E. MAYER (SBN 190969)
    mem@msk.com
EMILY F. EVITT (SBN 261491)
    efe@msk.com
DANIEL A. KOHLER (SBN 285501)
    dxk@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone:   (310)-312-2000
Facsimile:   (310)-312-3100

Attorneys for Plaintiff
Blizzard Entertainment, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLIZZARD ENTERTAINMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> BOSSLAND GMBH, a corporation; and Does 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 8:16-cv-01236 DOC (KESx) <br><br> Honorable David O. Carter <br><br> **NOTICE OF MOTION AND MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST BOSSLAND GMBH;** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF MARC E. MAYER AND CLINT RICE IN SUPPORT THEREOF** <br><br> [Proposed] Order and Judgment Lodged Concurrently Herewith <br><br> Date:      April 10, 2017 <br> Time:     8:30 a.m. <br> Ctrm.:    9C, Santa Ana |

Mitchell
Silberberg &
Knupp LLP

**TO DEFENDANT BOSSLAND GMBH AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 10, 2017, at 8:30 a.m., or as soon thereafter as this matter may be heard by the above-entitled Court, located at 411 W. Fourth Street, Santa Ana, California 92701, Plaintiff Blizzard Entertainment, Inc. ("Blizzard") will and hereby does move for an order entering default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2) against Defendant Bossland GMBH ("Bossland"). Bossland has been served with the Complaint, appeared in this action to contest jurisdiction, and is aware of this action but has knowingly elected not to proffer a defense.

Blizzard requests the following relief:

1.      An injunction, ordering that Bossland and all persons acting under its direction or control (including but not limited to its agents, subsidiaries, representatives and employees), shall immediately and permanently cease and desist from any and all of the following activities:

(a)      taking any steps on Bossland's own behalf or assisting others in distributing, advertising, marketing, selling, reselling, uploading, downloading, offering for sale, or otherwise disseminating in the United States any software whose use infringes any of Blizzard's U.S. copyrights, patents, or trademarks (Blizzard's "Intellectual Property"), circumvents technological measures that control access to Blizzard's games in the United States, or violates Blizzard's End User License Agreement ("EULA") with its U.S. customers, including but not limited to the software products known as "Honorbuddy," "Demonbuddy," "Stormbuddy," "Hearthbuddy," and "Watchover Tyrant," and any other software

Mitchell
Silberberg &
Knupp LLP

1

1  product designed to exploit or enable the exploitation of any game owned,

2  published, or operated by Blizzard;

3

4        (b)    obtaining, possessing, accessing or using in the United States any

5  software whose use infringes any of Blizzard's Intellectual Property, circumvents

6  technological measures that control access to Blizzard's games, or violates the

7  EULA, including but not limited to the software products known as

8  "Honorbuddy," "Demonbuddy," "Stormbuddy," "Hearthbuddy," and "Watchover

9  Tyrant," and any other software product designed to exploit or enable the

10  exploitation of any game owned, published, or operated by Blizzard;

11

12        (c)    assisting in any way with the creation or development in the United

13  States of any software whose use infringes any of Blizzard's Intellectual Property,

14  circumvents technological measures that control access to Blizzard's games, or

15  violates the EULA, including but not limited to the software products known as

16  "Honorbuddy," "Demonbuddy," "Stormbuddy," "Hearthbuddy," and "Watchover

17  Tyrant," and any other software product designed to exploit or enable the

18  exploitation of any game owned, published, or operated by Blizzard;

19

20        (d)    publishing or distributing in the United States any source code or

21  instructional material for the creation of any software whose use infringes any of

22  Blizzard's Intellectual Property, circumvents technological measures that control

23  access to Blizzard's games, or violates the EULA, including but not limited to the

24  software products known as "Honorbuddy," "Demonbuddy," "Stormbuddy,"

25  "Hearthbuddy," and "Watchover Tyrant," and any other software product designed

26  to exploit or enable the exploitation of any game owned, published, or operated by

27  Blizzard;

28

Mitchell
Silberberg &
Knupp LLP

2

1    (e)    selling, transferring, or assigning to any person or entity the

2  intellectual property in any product (including the rights in any source code) whose

3  use infringes any of Blizzard's Intellectual Property, circumvents technological

4  measures that control access to Blizzard's games, or violates the EULA, including

5  but not limited to the software products known as "Honorbuddy," "Demonbuddy,"

6  "Stormbuddy," "Hearthbuddy," and "Watchover Tyrant," and any other software

7  product designed to exploit or enable the exploitation of any game owned,

8  published, or operated by Blizzard;

9

10    (f)    operating, assisting or linking to any website located in the United

11  States or directed at United States residents that is designed to provide information

12  to assist others in accessing, developing or obtaining any software whose use

13  infringes any of Blizzard's Intellectual Property, circumvents technological

14  measures that control access to Blizzard's games, or violates the EULA, including

15  but not limited to the software products known as "Honorbuddy," "Demonbuddy,"

16  "Stormbuddy," "Hearthbuddy," and "Watchover Tyrant," and any other software

17  product designed to exploit or enable the exploitation of any game owned,

18  published, or operated by Blizzard;

19

20    (g)    investing or holding any financial interest in any enterprise which

21  Bossland knows or has reason to know is now, or intends in the future to be,

22  engaged in any activities in the United States that are prohibited by this Judgment

23  and Permanent Injunction.

24

25    (h)    reverse engineering, decompiling, packet editing, or otherwise

26  manipulating without authorization in the United States, any game owned,

27  published, or operated by Blizzard or a Blizzard subsidiary or providing assistance

28  to any person or entity engaged in such activities.

Mitchell
Silberberg &
Knupp LLP

3

2.      A monetary award to Blizzard, for Bossland's infringing conduct within the United States, in the sum of **$8,740,235.41,** constituting:

(a)      Statutory damages in the minimum allowable amount ($200 per violation) under § 1203(c)(3)(A) of the Digital Millennium Copyright Act ("DMCA"), for each of Bossland's 42,818 violations within the United States, totaling $8,563,600.00.  This amount is not punitive in nature.

(b)      Attorneys' fees totaling $174,872.00, and

(c)      Costs of suit totaling $1,763.41.

This Motion is brought on the grounds that entry of default judgment is appropriate in this case because: (1) Blizzard has satisfied the procedural requirements of Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55-1, (2) Blizzard would suffer prejudice if default judgment is not entered because it would be denied the right to judicial resolution of its claims, (3) the Complaint sets forth *prima facie* claims showing that Bossland is liable for inducement to infringe copyrights, contributory copyright infringement, vicarious copyright infringement, violation of Section 1201 of the DMCA (i.e. trafficking in circumvention devices), and intentional interference with contractual relations, (4) the monetary award sought by Blizzard is factually and legally supported and is reasonable, (5) there is no possibility of dispute regarding the material facts of the case, and (6) Bossland's default did not result from excusable neglect.

Notice of this Motion was served on Bossland's counsel of record via the Court's electronic filing system.

Mitchell
Silberberg &
Knupp LLP

4

1      Bossland is not a minor or incompetent person or in military service or

2  otherwise exempted under the Servicemembers Civil Relief Act (50 U.S.C. App.

3  § 521).

4

5      This Motion is based on this Notice of Motion and Motion for Default

6  Judgment, the attached memorandum of points and authorities, the supporting

7  declarations of Marc E. Mayer and Clint Rice and exhibits thereto, and the

8  pleadings, files and other materials that are on file with the Court or may be

9  presented at the hearing.

10

11  DATED: March 13, 2017              KARIN G. PAGNANELLI
                                      MARC E. MAYER
12                                    EMILY F. EVITT
                                      DANIEL A. KOHLER
13                                    MITCHELL SILBERBERG & KNUPP LLP

14

15                                    By:   /s/ Marc E. Mayer
                                           Marc E. Mayer
16                                         Attorneys for Plaintiff
                                           Blizzard Entertainment, Inc.

17

18

19

20

21

22

23

24

25

26

27

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................1

II.   STATEMENT OF FACTS.................................................3

III.  PROCEDURAL HISTORY AND BOSSLAND'S PURPOSEFUL DEFAULT...............................................8

IV.   BLIZZARD IS ENTITLED TO ITS REQUESTED RELIEF ......................9

    A.    Blizzard Has Satisfied The Procedural Requirements For Entry Of Default Judgment Against Bossland...................................11

    B.    The Allegations Of The Complaint, Taken As True, Establish Liability On Blizzard's Claims. ..................................11

    C.    The *Eitel* Factors Warrant Entry Of Default Judgment. ....................16

V.    BLIZZARD'S REQUESTED RELIEF IS APPROPRIATE ......................18

    A.    Blizzard Is Entitled To The Requested Permanent Injunction. ..........18

    B.    Blizzard Is Entitled To $8,563,600 In Minimum Statutory Damages For Bossland's Violations Of The DMCA. .......................21

    C.    Blizzard Is Entitled To Its Reasonable Attorneys' Fees And Costs. ..24

VI.   CONCLUSION ..............................................25

Mitchell
Silberberg &
Knupp LLP

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A&M Records v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ........................................................................ 15

*Adobe Sys. Inc. v. One Stop Micro, Inc.*,
  84 F. Supp. 2d 1086 (N.D. Cal. 2000) ........................................................... 15

*Apple Computer, Inc. v. Franklin Computer Corp.*,
  714 F.2d 1240 (3d Cir. 1983) ......................................................................... 20

*Arista Records LLC v. Lime Group LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........................................................... 14

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
  28 F. Supp. 3d 1006 (C.D. Cal. 2013) ............................................... 4, 15, 16

*Blizzard Entm't, Inc. v. Reeves*,
  2010 U.S. Dist. LEXIS 85560 (C.D. Cal. Aug. 10, 2010) .............. 10, 22, 23, 24

*Capitol Records, Inc. v. Thomas-Rasset*,
  799 F. Supp. 2d 999 (D. Minn. 2011) ............................................................ 21

*Craigslist, Inc. v. Naturemarket, Inc.*,
  694 F. Supp. 2d 1039 (N.D. Cal. 2010) .......................................................... 22

*Davidson & Assocs., Inc. v. Internet Gateway*,
  334 F. Supp. 2d 1164 (E.D. Mo. 2004) .......................................................... 16

*Dish Network, L.L.C. v. SatFTA*,
  2011 U.S. Dist. LEXIS 25038 (N.D. Cal. Mar. 9, 2011) ................................ 22

*Dish Network L.L.C. v. Ward*,
  2010 U.S. Dist. LEXIS 142090 (S.D. Fla. Jan. 8, 2010) ................................ 24

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ........................................................................................ 18

*EchoStar Satellite LLC v. ViewTech, Inc.*,
  2011 U.S. Dist. LEXIS 42709 (S.D. Cal. Apr. 20, 2011) ............................... 24

Mitchell
Silberberg &
Knupp LLP

ii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Eitel v. McCool*,
  782 F.2d 1470 (9th Cir. 1986) ......................................................................*passim*

*Elektra Entm't Group Inc. v. Crawford*,
  226 F.R.D. 388 (C.D. Cal. 2005) ................................................................ 16

*Elektra Entm't Grp., Inc. v. Bryant*,
  2004 U.S. Dist. LEXIS 26700 (C.D. Cal. Feb. 13, 2004) ............... 10, 16, 17, 20

*Henry v. Sneiders*,
  490 F.2d 315 (9th Cir. 1974) ...................................................................... 10

*Lava Records, LLC v. Ates*,
  2006 U.S. Dist. LEXIS 46683 (W.D. La. July 11, 2006) ................................. 19

*MAI Sys. Corp. v. Peak Comput., Inc.*,
  991 F.2d 511 (9th Cir. 1993) ...................................................................... 13

*Malibu Media, LLC v. Guastaferro*,
  2015 U.S. Dist. LEXIS 99217 (E.D. Va. July 28, 2015) ................................. 21

*Marcelos v. Dominguez*,
  2009 U.S. Dist. LEXIS 5306 (N.D. Cal. Jan. 16, 2009) ................................. 17

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010) ............................................................ 4, 12, 13

*Meadows v. Dom. Rep.*,
  817 F.2d 517 (9th Cir. 1987) ...................................................................... 17

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal 2007) ............................................. 18, 19, 20

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ............................................................................ 14, 15

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107 (9th Cir. 1998) .................................................................... 14

*Microsoft Corp. v. Coppola*,
  2007 U.S. Dist. LEXIS 40515 (N.D. Cal. May 24, 2007) ................................. 18

Mitchell
Silberberg &
Knupp LLP

1

**TABLE OF AUTHORITIES**
**(continued)**

2

3

**Page(s)**

*Midway Mfg. Co. v. Artic Int'l, Inc.,*
    704 F.2d 1009 (7th Cir. 1983) ........................................................ 14

*Nintendo of Am., Inc. v. Dragon Pac. Int'l,*
    40 F.3d 1007 (9th Cir. 1994) ......................................................... 21

*Ortiz-Gonzalez v. Fonovisa,*
    277 F.3d 59 (1st Cir. 2002) ........................................................... 22

*PepsiCo, Inc. v. Cal. Sec. Cans,*
    238 F. Supp. 2d 1172 (C.D. Cal. 2002)................................... 16, 17

*PepsiCo v. Triunfo-Mex, Inc.,*
    189 F.R.D. 431 (C.D. Cal. 1999)................................................... 10

*RealNetworks, Inc. v. Streambox, Inc.,*
    2000 U.S. Dist. LEXIS 1889 (W.D. Wash. Jan. 18, 2000) .............. 12

*Sony Computer Entm't Am., Inc. v. Divineo, Inc.,*
    457 F. Supp. 2d 957 (N.D. Cal. 2006)........................................... 22

*Sony Computer Entm't Am., Inc. v. Filipiak,*
    406 F. Supp. 2d 1068 (N.D. Cal. 2005)......................................... 22

*Sony Computer Entm't Am. Inc. v. GameMasters,*
    87 F. Supp. 2d 976 (N.D. Cal. 1999)............................................. 12

*Taylor Corp. v. Four Seasons Greetings, LLC,*
    403 F.3d 958 (8th Cir. 2005) ......................................................... 20

*TeleVideo Sys., Inc. v. Heidenthal,*
    826 F.2d 915 (9th Cir. 1987) .................................................... 10, 11

*Twentieth Century Fox Film Corp. v. Streeter,*
    438 F. Supp. 2d 1065 (D. Ariz. 2006)........................................... 24

*Universal City Studios, Inc. v. Reimerdes,*
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) ........................................... 12

*Visoneering Constr. v. U.S. Fidelity & Guar.,*
    661 F.2d 119 (6th Cir. 1981) ......................................................... 10

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Walt Disney Co. v. Powell,*
  897 F.2d 565 (D.C. Cir. 1990)...................................................................... 18

*Warner Bros. Entm't Inc. v. Caridi,*
  346 F. Supp. 2d 1068 (C.D. Cal. 2004)................................................. 10, 17

## STATUTES

17 U.S.C.
  § 106 ................................................................................................................ 13
  § 502 ................................................................................................................ 18
  § 505 ......................................................................................................... 24, 25
  § 1201 ......................................................................................................*passim*
  § 1203 ....................................................................................... 18, 21, 22, 23

Digital Millenial Copyright Act (DMCA)............................................*passim*

The Servicemembers Civil Relief Act
  (50 U.S.C. App. § 521) ................................................................................ 11

## OTHER AUTHORITIES

4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright,*
  (Rev. Ed.)........................................................................................................ 22

Fed. R. Civ. P. 55(b)(2) ......................................................................................... 9, 11

Local Rule
  55 .................................................................................................................... 17
  55-1 .............................................................................................................. 9, 11
  55-3 ................................................................................................................ 24

Mitchell
Silberberg &
Knupp LLP

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.    INTRODUCTION**

This action arises from the development, distribution, and sale of software "hacks" or "cheats" in the United States that are designed to alter and impair the online functionality of Plaintiff Blizzard Entertainment, Inc.'s ("Blizzard") popular computer games, by defendant Bossland GmbH ("Bossland").  Bossland initially appeared in this action through experienced and reputable counsel in order to contest personal jurisdiction.  However, after the Court denied Bossland's motion to dismiss for lack of jurisdiction Bossland elected to voluntarily default rather than defend this case on the merits.  The court clerk entered Bossland's default on February 16, 2017.  Blizzard now moves for issuance of a default judgment against Bossland.

Bossland is an archetypal bad actor.  The products at issue in this case have only one purpose -- to allow Bossland's customers to cheat in Blizzard's games -- to the detriment of Blizzard and its player base, and to the massive financial benefit of Bossland and its employees.  Bossland has made millions of dollars from this business, knowing that its products harm Blizzard and that their use in the United States is unlawful.  For months leading up to this litigation, Bossland's principal, Zweten Letschew, bragged online that Blizzard could not sue it in the United States because, according to Bossland, courts in the United States lack personal jurisdiction over Bossland.  *See* Declaration of Mayer E. Decl. ("Mayer Decl.), Ex. 4 ("Now Blizzard wants to try it [litigation] in the US . . . . US courts in general think they can decide about the future of anyone, however even they have regulations.").  Upon learning that this Court ***could*** constitutionally exercise jurisdiction over Bossland, Bossland promptly notified counsel for Blizzard that, rather than defend its conduct on the merits, it had elected to default.

Bossland's goal with respect to this purely strategic default is clear: it hopes that a default judgment issued by this Court will be difficult to enforce in

Mitchell
Silberberg &
Knupp LLP

1

Germany, and that its foreign assets will go undisturbed.  Thus, Bossland apparently intends to continue "business as usual," distributing its infringing products around the world, including in the United States, with perceived impunity.  In the meantime, by defaulting Bossland is attempting to avoid being subjected to any discovery and prevent Blizzard from learning the scope of its conduct and the amount of profit it has received from its unlawful products in the United States.

Default judgment against Bossland is manifestly appropriate.  By its activities, Bossland has engaged in a variety of unlawful activities.  Specifically:

● Bossland distributed and actively encouraged the use of software which, when used by the end user, creates a derivative work of one or more of the Blizzard Games.  Bossland also encouraged and facilitated acts of copyright infringement by its freelance contractors and software developers.  This conduct constitutes secondary copyright infringement.

● Bossland created and distributed computer files designed to circumvent and bypass access controls put into place by Blizzard.  This conduct violates Section 1201 of the DMCA.

● Bossland, with knowledge that others had entered into valid and binding contracts with Blizzard, encouraged those people to engage in conduct that plainly violated those contracts.

The relief that Blizzard seeks in this motion is eminently reasonable and appropriate.  It is limited only to those Bossland products that violate Blizzard's rights, and is further limited only to conduct Bossland has committed or may commit in the future within the United States.  With respect to monetary relief, Blizzard seeks only the **minimum** awardable statutory damages for violation of Section 1201 of the Copyright Act.  It seeks such an award not to punish Bossland or obtain an unjustified windfall, but as a fair monetary award *in lieu* of actual damages, which are undoubtedly very large but are extremely difficult to precisely

Mitchell
Silberberg &
Knupp LLP

2

calculate, especially without the benefit of discovery.  Additionally, the form of injunctive relief sought by Blizzard is one that other courts (including Courts in this District) have previously approved in analogous cases.

Because there is no dispute as to the relevant facts and law, and the requested relief is reasonable and appropriate, the requested default judgment should promptly be entered in favor of Blizzard.

## II.   STATEMENT OF FACTS

**Blizzard and its Games**.  Blizzard is a developer and publisher of high-quality computer games. Its products include the massively popular online computer games "World of Warcraft" ("WoW"), "Diablo 3" ("D3"), "Heroes of the Storm" ("HOTS"), "Hearthstone," and "Overwatch"  (WoW, D3, HOTS, Hearthstone, and Overwatch collectively are referred to as the "Blizzard Games."). Compl., ¶¶ 1, 13.  The success of each of the Blizzard Games rests in large part on Blizzard's ability to offer a consistently compelling player experience so that its customers remain invested in the Blizzard Games and play them for a sustained period of time.  *Id.* ¶ 14.  *See also* Declaration of Clint Rice ("Rice Decl."), ¶¶ 4-8. Accordingly, it is critical to Blizzard's business model that its online games are free from interference by cheaters, hackers, or others who seek to manipulate the game experience (either for their own personal gain or simply to disrupt and annoy others).

In order to protect the integrity of its products and the sanctity of its users' game experience, Blizzard employs both technical and contractual security measures.  Compl., ¶ 20.

**Blizzard's Technical Measures.**  In order to protect its games from cheating and unauthorized exploitation, Blizzard has developed and employs a software program called "Warden."  Warden is a technical measure that prevents unauthorized access to the Blizzard Games, restricts users from loading

unauthorized copies of the Blizzard Games, and otherwise monitors the game client and environment for malicious or unauthorized software processes. *Id.* ¶ 21. Among other things, Warden runs targeted scans for the presence and/or use of "signatures" of known unauthorized third-party programs that facilitate cheating or allow the modification of the game interface and/or experience in any way not authorized by Blizzard. *Id.* ¶ 22. If Warden detects that a user is engaged in prohibited hacking or cheating activities, it will deny that user access to the Blizzard Game. *Id.* As a result, for any hack or cheat software to be effective, the software must be designed to prevent its detection by Warden, either by concealing itself from Warden or by disabling Warden. *Id. See MDY Indus., LLC v. Blizzard Entm't, Inc.,* 629 F.3d 928, 954 (9th Cir. 2010) (cheat software circumvented Waden in violation of 17 U.S.C. § 1201(a)(2)).

**Blizzard's Contractual Measures.** In order to access, download, or play any of the Blizzard Games, users must create and register an account with Blizzard's proprietary Battle.net system. *Id.* ¶ 24. To create a Battle.net account, users must expressly manifest their assent to the "Battle.net End User License Agreement" (the "EULA"). *Id.* The entire text of the EULA is displayed to users at the time they are asked to assent to its terms. The EULA also is made available on Blizzard's website at http://us.blizzard.com/en-us/company/legal/eula.html. *See Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013) (discussing Blizzard's EULA).

The EULA is a conditional, limited license agreement between Blizzard and its users. Under the EULA, Blizzard licenses the right to download, copy, install, and play the Blizzard Games, subject to certain terms, restrictions, and conditions. Among other provisions, the EULA expressly states that, as a condition to the limited license: "You agree that you will not, in whole or in part or under any circumstances, do the following:

Mitchell
Silberberg &
Knupp LLP

4

Derivative Works: Copy or reproduce (except as provided in Section 1(B)), translate, reverse engineer, derive source code from, modify, disassemble, decompile, or create derivative works based on or related to the Battle.net Client or Games.

Cheating: Create, use, offer, advertise, make available and/or distribute the following or assist therein:

1.      Cheats; i.e. methods, not expressly authorized by Blizzard, influencing and/or facilitating the gameplay, including exploits of any in-game bugs, and thereby granting you and/or any other user an advantage over other players not using such methods;

2.      Bots; i.e. any code and/or software, not expressly authorized by Blizzard, that allows the automated control of a Game, Battle.net and/or any component or feature thereof, e.g. the automated control of a character in a Game;

3.      Hacks; i.e. accessing or modifying the software of a Game or Battle.net in a manner, not expressly authorized by Blizzard; and/or

4.      any code and/or software, not expressly authorized by Blizzard, that can be used in connection with the Battle.net client, Battle.net, a Game and/or any component or feature thereof which changes and/or facilitates the gameplay;"

Compl., ¶ 25.  The Blizzard Games are made available to the public exclusively through Blizzard's proprietary Battle.net system.  (This includes any physical copies of the Blizzard Games, which must be activated and played through the Battle.net system.)  Thus, it is not possible for a user to lawfully obtain access to or play any of the Blizzard Games without expressly consenting to the EULA.  *Id.* ¶ 26.

**Bossland and its Hacks.** Bossland is engaged in the for-profit business of creating, producing, marketing, distributing, and supporting a suite of malicious software products that specifically are designed to harm Blizzard and the Blizzard Games.  Compl., ¶ 27.  Defendants have created and distributed numerous cheat programs for use with Blizzard's Games.  These include: "Honorbuddy" (for use with WoW), "Demonbuddy" (for use with D3), "Stormbuddy" (for use with

Mitchell
Silberberg &
Knupp LLP

5

HOTS), "Hearthbuddy" (for use with Hearthstone), and "Watchover Tyrant" (for use with Overwatch) (these programs collectively are referred to as the "Bossland Hacks"). *Id.* ¶ 29. Subscriptions for each of the Bossland Hacks are sold through dedicated websites owned and operated by Bossland, at a minimum cost of 12.95 Euros (approximately $14.50) per month or as much as 199 Euros (approximately $224) for a full-featured yearly subscription. *Id.*,¶¶ 30, 34.

Bossland has received enormous sums of money from selling and distributing its products in the United States. ***According to Bossland***, during the period of time from July of 2013 until June of 2016, Bossland sold no less than ***118,939*** units of its cheats to users ***within the United States***. Mayer Decl., Ex. 7 (Declaration of Zweten Letschew I/S/O Bossland's Motion to Dismiss (ECF No. 16-1)), ¶¶ 44-79. Moreover, according to Bossland, this figure represents only between 10 and 30% of its global sales for the same period. *Id.*; *see also* Order Denying Bossland's Motion to Dismiss (ECF No. 23) (the "MTD Order") at 2. In this Motion, Blizzard only seeks damages for the exploitation of the Bossland Hacks in the United States.

**Bossland's Unlawful Circumvention.** Normally, Blizzard's Warden technology prevents users of Blizzard's products from using cheats and hacks such as the Bossland Hacks. Thus, in order for the Bossland Hacks to work, they must avoid, bypass, or circumvent Blizzard's Warden technology. One of the ways that Bossland does this is by building into each of the Bossland Hacks a software application known as "Tripwire." Compl., ¶ 39. Bossland describes Tripwire as follows:

> Tripwire is anti-spyware technology built into Bossland GmbH products to "watch the watchers." Tripwire is always active. It is constantly looking at [Warden]. Tripwire will automatically render all active sessions of a Buddy bot as invalid if it detects [Warden] doing anything sneaky. Bossland GmbH can also manually activate Tripwire upon discovery of something untoward.

*Id.*  Tripwire is incorporated into each of the Bossland Hacks.  *Id.* ¶ 40.  The sole purpose of Tripwire is to avoid detection of the Bossland Hacks by Warden, and Defendants advertise it as such.  *Id.*  As Bossland posts on its forum, "the Buddy bot is responsible for avoiding client-side detection [i.e. Warden]." (emphasis added).  *Id.*  The Bossland Hacks would not have any commercial value or appeal without the Tripwire technology incorporated therein.  *Id.*

**The Severe and Irreparable Harm to Blizzard**.  Bossland has caused and continues to cause serious harm to the value of Blizzard's games and to Blizzard's online community.  *See* MTD Order at 2 ("Bossland and its Bots undermine Blizzard's efforts to create games that are enjoyable and fair to players of all skill levels.").  Such harm is immediate, massive and irreparable, and includes the following.

First, Bossland's products irreparably harm the ability of Blizzard's legitimate customers in the United States to enjoy and participate in its games.  For example, certain of Blizzard's games (such as Hearthstone, Overwatch, and Heroes of the Storm) are competitive multiplayer games that require that users be on a level playing field in order to be enjoyable.  Others (World of Warcraft and Diablo 3) rely on their immersive game worlds to keep their players interested.  The Bossland Hacks destroy both the level playing field players expect in a competitive Blizzard Game, and the immersive game worlds players expect from the other Blizzard Games.  As a result, affected players may (and do) grow dissatisfied with the Blizzard Games and stop playing.  *See* Rice Decl., ¶¶ 9-15.

When Blizzard loses a player, it directly results in a loss of revenue to Blizzard.  Compl., ¶ 48.  Thousands of customers have cancelled World of Warcraft subscriptions, citing bots as the reason for their cancellation.  *Id.*; Rice Decl., ¶ 12.  A World of Warcraft subscription costs $14.99 per month, and thus the loss of a single long-term subscriber could result in damage to Blizzard of approximately $150 per year.  Compl., ¶ 48. In addition, Hearthstone and Heroes

of the Storm are "free to play" games, and generate revenue for Blizzard only when players invest in "in-game" microtransactions (such as by purchasing new cards or unlocking cosmetic modifications).  When users stop playing, they will no longer purchase in-game items and will not recommend the game to friends.  This also results in a direct loss of revenue to Blizzard.

Second, Bossland's conduct has forced Blizzard to spend large sums of money (and equally large amounts of time) attempting to remediate the damage caused by the Bossland Hacks.  Rice Decl., ¶¶ 9, 12-14; Compl., ¶ 48.  This includes creating and releasing new versions of the Blizzard Games that counteract the Bossland Hacks, responding to player complaints, employing personnel to police the games to detect the use of the Bossland Hacks, and "banning" (*i.e.*, permanently deleting the accounts of) users who are using the Bossland Hacks.  *Id.*

Third, Bossland's conduct harms Blizzard's reputation and results in the loss of customer goodwill, in the United States and worldwide.  Compl., ¶ 48.

Unless Bossland is permanently enjoined, Blizzard will continue to suffer severe monetary and non-monetary harm from the Bossland Hacks.  *Id.* ¶ 49.

## III.  PROCEDURAL HISTORY AND BOSSLAND'S PURPOSEFUL DEFAULT.

Blizzard filed its Complaint on July 1, 2016.  ECF No. 1.  Bossland was timely served with the initiating papers through the provisions of the Hague Service Convention.  Service on Bossland was completed on October 6, 2016.  Mayer Decl., ¶¶ 2, 4.

On November 18, 2016, Bossland appeared in this action (via two sets of counsel) and filed a Motion to Dismiss Blizzard's Complaint, arguing that this Court lacked personal jurisdiction over Bossland.  ECF No. 16.  On January 25, 2017, the Court denied Bossland's motion and ruled that it could constitutionally assert personal jurisdiction over Bossland.  ECF No. 23.  Bossland filed a motion

Mitchell
Silberberg &
Knupp LLP

to certify the question of personal jurisdiction to the Ninth Circuit on February 7, 2017, and at the same time requested additional time to file its Answer to Blizzard's Complaint.  On February 10, 2017, the Court denied Bossland's request for a further extension, and ordered Bossland to file its Answer within twenty-four hours.  ECF No. 27.  Bossland did not file its answer within twenty-four hours, or at all.  Instead, on February 14, 2017, counsel for Bossland contacted counsel for Blizzard and notified them that Bossland had ***voluntarily elected*** to default, and would not defend this litigation.  Mayer Decl., ¶ 7.  Subsequently, on February 15, 2017, Bossland withdrew its motion for certification.  ECF No. 29.  The Clerk entered Bossland's default on February 16, 2017.  ECF No. 30.

Bossland's decision to default is a calculated and bad-faith tactic designed to shield its unlawful conduct from the reach of United States law.  By defaulting, Bossland apparently hopes to block Blizzard from taking any discovery into its conduct, thereby concealing from Blizzard the scope of its unlawful conduct, the amount of revenue it has received from the Bossland Hacks, and the whereabouts of its assets.  Bossland also hopes that by hiding this information it may avoid a monetary judgment or render any judgment that may be entered against it either unenforceable in the courts of Germany or uncollectable.  Thus, Bossland hopes that it will be able to continue to conduct business as usual, and that Blizzard will be unable to avail itself of the relief to which it is entitled.

## IV.    BLIZZARD IS ENTITLED TO ITS REQUESTED RELIEF

In addition to the procedural requirements set forth in Local Rule 55-1 and Fed. R. Civ. P. 55(b)(2), a court's decision to grant default judgment is guided by the following factors (known as the *Eitel* factors):

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal

Mitchell
Silberberg &
Knupp LLP

9

1   Rules of Civil Procedure favoring decisions on the merits.

2

3   *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986); *see also Warner Bros.*

4   *Entm't Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1071-73 (C.D. Cal. 2004) (granting

5   default judgment based on *Eitel* factors). While the decision to grant a default

6   judgment is left to the sound discretion of the Court, "default judgments are more

7   often granted than denied." *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432

8   (C.D. Cal. 1999).

9   In determining whether to grant a default judgment, "[t]he general rule of

10   law [is] that upon default the factual allegations of the complaint, except those

11   relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc. v.*

12   *Heidenthal,* 826 F.2d 915, 917-18 (9th Cir. 1987). *See also Visoneering Constr. v.*

13   *U.S. Fidelity & Guar.*, 661 F.2d 119, 124 (6th Cir. 1981) ("Well pleaded

14   allegations of the petition . . . are taken as admitted on a default judgment.").

15   While a plaintiff must "prove up" damages when seeking a default judgment, this

16   evidentiary burden is "relatively lenient." *Elektra Entm't Grp., Inc. v. Bryant,* 2004

17   U.S. Dist. LEXIS 26700, at *5 (C.D. Cal. Feb. 13, 2004).

18   "[T]he Court must draw all reasonable inferences in Plaintiff's favor on

19   account of defendant's failure to participate in the litigation process*." Blizzard*

20   *Entm't, Inc. v. Reeves,* 2010 U.S. Dist. LEXIS 85560, at *8 (C.D. Cal. Aug. 10,

21   2010). That rule is particularly applicable here, since Bossland's default certainly

22   was driven by a desire to deprive Blizzard of the discovery it requires to accurately

23   and fully assess the precise number of Bossland Hacks in the marketplace and the

24   harm they are causing to Blizzard and its game. *See Henry v. Sneiders*, 490 F.2d

25   315, 317 (9th Cir. 1974) (noting on motion for default judgment that "[a]ny

26   insufficiency of plaintiff's evidence was a direct result of appellant's refusal to

27   comply with a legitimate request for discovery.").

28

1    Blizzard has satisfied the procedural requirements of the Federal and Local

2    Rules, the *Eitel* factors weigh in favor of entering default judgment against

3    Bossland, and Blizzard's requested relief is reasonable and supported.

4    **A.    Blizzard Has Satisfied The Procedural Requirements For Entry**

5    **Of Default Judgment Against Bossland.**

6    The requirements of Federal Rule of Civil Procedure 55(b)(2) and Local

7    Rule 55-1 plainly have been met.  Bossland has been served, and has deliberately

8    and strategically elected not to defend this litigation.  Mayer Decl., ¶¶ 4-8.  The

9    clerk has entered Bossland's default..  *Id*. ¶ 9.  Bossland is not an infant or

10   incompetent.  *Id.* ¶ 10; *see* L.R. 55-1(c).  The Servicemembers Civil Relief Act (50

11   U.S.C. App. § 521) does not apply.  Mayer Decl.,  10; *see* L.R. 55-1(d).  Blizzard

12   timely notified Bossland of this Motion for Default Judgment.  Mayer Decl., ¶ 11,

13   Exs. 2, 3; *see* L.R. 55-1(e); Fed. R. Civ. P. 55(b)(2).

14   **B.    The Allegations Of The Complaint, Taken As True, Establish**

15   **Liability On Blizzard's Claims.**

16   After the entry of default, the factual allegations of the complaint are taken

17   as true.  *Heidenthal*, 826 F.2d at 917-18.  Blizzard's Complaint pleads facts

18   sufficient, as a matter of law, to establish that Bossland is liable for violations of

19   the DMCA, secondary copyright infringement (specifically, inducement of

20   copyright infringement, contributory and vicarious infringement), and intentional

21   interference with contract.

22   **Violations of the DMCA**.  The "anti-trafficking" provision of the Digital

23   Millennium Copyright Act (17 U.S.C. § 1201(a)(2)) provides:

24   No person shall manufacture, import, offer to the public,
     provide, or otherwise traffic in any technology, product,
25   service, device, component, or part thereof, that: (A) is
     primarily designed or produced for the purpose of
26   circumventing a technological measure that effectively
     controls access to a work protected under this title; (B)
27   has only limited commercially significant purpose or use
     other than to circumvent a technological measure that
28   effectively controls access to a work protected under this

Mitchell
Silberberg &
Knupp LLP

11

1  title; or (C) is marketed by that person or another acting
2  in concert with that person with that person's knowledge
   for use in circumventing a technological measure that
3  effectively controls access to a work protected under this
   title.

4  17 U.S.C. § 1201(a)(2).  Blizzard's Complaint properly alleges all of the elements

5  of a Section 1201(a)(2) violation:

6        ●      Blizzard has incorporated into its games technological measures,

7  including Warden, that effectively control access to the Blizzard Games, including

8  to the dynamic audiovisual elements that comprise the games' virtual worlds.

9  Compl., ¶¶ 21-23; *MDY Indus. v. Blizzard Entm't, Inc.,* 629 F.3d 928, 942, 954

10  (9th Cir. 2010) (security software that scans for unauthorized cheats and denies

11  access to computer game world was an effective access-control measure);

12  *RealNetworks, Inc. v. Streambox, Inc.*, 2000 U.S. Dist. LEXIS 1889, at *18 (W.D.

13  Wash. Jan. 18, 2000) (technology that restricted playback of digital media files was

14  a technological measure that "effectively controls access").

15        ●      The Bossland Hacks are comprised of or contain technologies,

16  products, services, devices, components, or parts thereof that primarily are

17  designed and produced for the purpose of circumventing technological measures,

18  including Warden, that effectively control access to Blizzard's copyrighted work,

19  and thereby protect the exclusive rights of a copyright owner.  Compl., ¶¶ 38-40;

20  *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 317 (S.D.N.Y.

21  2000) (computer program "unquestionably is 'technology' within the meaning of"

22  the DMCA); *Reimerdes*, 111 F. Supp. 2d at 319 (software that permitted users to

23  access and copy encrypted DVDs violated Section 1201(a)(2)); *Sony Computer*

24  *Entm't Am. Inc. v. GameMasters*, 87 F. Supp. 2d 976, 987 (N.D. Cal. 1999)

25  (Defendant's "GameEnhancer" circumvented plaintiff's access control technology

26  that ensured that PlayStation consoles operate only when encrypted data is read

27  from an authorized CD-ROM).

28

Mitchell
Silberberg &
Knupp LLP

12

1   ●   The Bossland Hacks have no commercially significant purpose or use

2   other than to circumvent a technological measure that effectively controls access to

3   copyrighted work and that protects the exclusive rights of a copyright owner.

4   Compl., ¶ 54; *MDY Indus.*, 629 F.3d at 953 (software bot had no purpose other

5   than to facilitate the playing of an online computer game).

6   ●   Bossland markets the Bossland Hacks with knowledge of their use to

7   circumvent Blizzard's technological access controls and copyright protection.

8   Compl., ¶ 55.

9   ●   As a result of the foregoing, Bossland is offering to the public,

10   providing, or otherwise trafficking in technology in violation of 17 U.S.C.

11   § 1201(a)(2).

12   **Copyright Infringement**.  As the owner of the copyright in the Blizzard

13   Games (Compl., ¶ 9), Blizzard possesses the exclusive rights to, among other

14   things, reproduce the Blizzard Games, distribute the Blizzard Games, and create

15   derivative works of (i.e., adapt) the Blizzard Games.  17 U.S.C. § 106(1), (2), (3).

16   Blizzard has sufficiently alleged that the creation, distribution, and use of the

17   Bossland Hacks infringes Blizzard's copyright in a number of ways, and that

18   Bossland is secondarily liable for each of those acts of infringement under theories

19   of inducement to infringe copyrights, contributory infringement, and vicarious

20   infringement.

21   First, in order to create, improve, test, and maintain the Bossland Hacks,

22   Bossland employees (or freelance hackers retained by Bossland) fraudulently

23   obtained access to Blizzard's software clients for each of the Blizzard Games.

24   Compl., ¶¶ 41-43.  Once in possession of Blizzard's copyrighted software code for

25   the Blizzard Games, Bossland or those acting on its behalf engaged in acts of

26   unauthorized reproduction, adaptation, and/or distribution of Blizzard's games as

27   part of the process by which they created and/or maintained the Bossland Hacks.

28   For example, to build the Bossland Hacks, individuals working on behalf of

Mitchell
Silberberg &
Knupp LLP

13

1    Bossland loaded the Blizzard Games onto their personal computers and then used

2    third party software to either obtain Blizzard's source code or to obtain and analyze

3    data that would be necessary for the creation of the Bossland Hacks.  *See MAI Sys.*

4    *Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 519 (9th Cir. 1993) (unauthorized

5    copies of software in RAM memory constituted unauthorized reproductions under

6    the Copyright Act).

7           Second, when users download, install, and use the Bossland Hacks they

8    infringe Blizzard's copyright by altering the Blizzard Games' gameplay and

9    presentation, thereby creating a derivative work of the video game.  For example,

10   Overwatch Tyrant generates a dynamic screen overlay which it then incorporates

11   into Overwatch's screen display.  *See* Compl., ¶¶ 32-37; 65; 71; 77;  *Midway Mfg.*

12   *Co. v. Artic Int'l, Inc.,* 704 F.2d 1009, 1013-14 (7th Cir. 1983); *Micro Star v.*

13   *Formgen Inc.*, 154 F.3d 1107, 1112 (9th Cir. 1998).

14          Blizzard's Complaint properly alleges that Bossland is secondarily liable for

15   the foregoing infringements in the following ways:

16   ●    ***Inducement to Infringe.***  "[O]ne who distributes a device with the

17   object of promoting its use to infringe copyright, as shown by clear expression or

18   other affirmative steps taken to foster infringement, is liable for the resulting acts

19   of infringement by third parties." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,*

20   *Ltd.*, 545 U.S. 913, 918 (2005).  Bossland has encouraged and induced third-party

21   "freelancers" or contractors in the United States to fraudulently obtain access to the

22   Blizzard Games and then, having done so, to engage in unauthorized reproduction

23   of the Blizzard Games.  Compl., ¶ 65.  Bossland also has actively encouraged and

24   induced users of the Bossland Hacks located in the United States to engage in

25   direct infringement of Blizzard's games, including, among other things, by

26   promoting the Bossland Hacks and providing users of Bossland Hacks within the

27   United States with the tools to infringe, instructions on how to install and use the

28   Bossland Hacks, instructions on how to use the Bossland Hacks in a manner least

Mitchell
Silberberg &
Knupp LLP

14

likely to be caught or arouse suspicion, and the ability to infringe anonymously. Compl., ¶¶ 29-36; 41-43; 64-69; *Grokster, Ltd.*, 545 U.S. at 918; *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) (defendant "actively assisted LimeWire users in committing infringement" by offering technical assistance to users, thereby helping users obtain unauthorized copies of recordings).

● ***Contributory Infringement.*** "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001). Bossland has actual and constructive knowledge of the infringements by users of the Bossland Hacks in the United States. Compl., ¶ 71. Bossland has materially contributed to the foregoing infringements, including by creating the Bossland Hacks, making the Bossland Hacks available to the public in the United States, instructing users how to install and operate the Bossland Hacks, and updating and modifying the Bossland Hacks to ensure that they continue to function effectively despite Blizzard's attempts to disable them. *Id.* ¶¶ 70-75; *Napster, Inc.*, 239 F.3d at 1019.

● ***Vicarious Infringement.*** "[One] infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. Bossland has the right and ability to supervise and control the infringing conduct of users of the Bossland Hacks within the United States. Compl., ¶ 77. Bossland has failed and refused to exercise such supervision and control to limit infringement to the extent required by law. *Id.* Bossland derives a direct financial benefit from this infringement, including from sales of the Bossland Hacks in the United States through Bossland's websites. *Id.* ¶¶ 27-36; *Grokster*, 545 U.S. at 930.

**Intentional Interference with Contractual Relations**. "End User License" agreements (including Blizzard's EULA) for online services are enforceable

1   contracts under California law.  *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,

2   28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013) (granting summary judgment against

3   hack maker for inducing breach of Blizzard's EULA); *see also Adobe Sys. Inc. v.*

4   *One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1089-93 (N.D. Cal. 2000) (end user

5   license agreement valid under California law); *Davidson & Assocs., Inc. v. Internet*

6   *Gateway*, 334 F. Supp. 2d 1164, 1170-71, 1177-78 (E.D. Mo. 2004), *aff'd*, 422

7   F.3d 630 (8th Cir. 2005).

8        As is alleged in the Complaint, Bossland's users located in the United States

9   violate Blizzard's EULA (which Bossland representatives personally reviewed and

10  assented to) each time they use a Bossland Hack in connection with a Blizzard

11  Game.  Compl.,¶¶ 44-47, 82-90.  Furthermore, as is alleged in the Complaint,

12  Bossland intentionally induced its users in the United States to breach the EULA

13  by selling and distributing the Bossland hacks, despite its knowledge that licensed

14  users of the Blizzard Games were required to assent to the EULA.  *Id.*  As set forth

15  below, this conduct has caused substantial damage to Blizzard.  *Ceiling Fan*

16  *Software LLC*, 28 F. Supp. 3d at 1015-16.

17       **C.   <u>The *Eitel* Factors Warrant Entry Of Default Judgment.</u>**

18       **(1)    *Possibility of Prejudice***:  The first *Eitel* factor considers whether

19  Blizzard will suffer prejudice if default judgment is not entered.  *Eitel*, 782 F.2d at

20  1471-72.  Prejudice exists where, absent entry of a default judgment, the plaintiff

21  would lose the right to a judicial resolution of its claims and would be without

22  other recourse.  *See Elektra Entm't Group Inc. v. Crawford*, 226 F.R.D. 388, 392

23  (C.D. Cal. 2005); *Bryant*, 2004 U.S. Dist. LEXIS 26700, at *8.  Without a default

24  judgment, Blizzard will be deprived of the right to judicial resolution of its claims,

25  and Bossland will have profited from its conduct with impunity.

26       **(2)    *Merits of Claim and (3) Sufficiency of Complaint***:  The second and

27  third *Eitel* factors "require that a plaintiff state a claim on which the [plaintiff] may

28  recover."  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal.

Mitchell
Silberberg &
Knupp LLP

16

2002) (internal citations omitted).  As set forth above, Blizzard has stated numerous claims for relief.

(**4**)    ***Amount at Stake***:  Under the fourth *Eitel* factor, "the court must consider the amount of money at stake in relation to the seriousness of [defendant's] conduct."  *PepsiCo*, 238 F. Supp. 2d at 1176.  As discussed below, the monetary damages at stake are in the millions of dollars, including statutory damages under the DMCA.

(**5**)    ***Possibility of Dispute Regarding Material Facts***:  The fifth *Eitel* factor requires the Court to consider the possibility of a dispute as to a material fact.  *Eitel*, 782 F.2d at 1471-72.  As a threshold matter, there is no possible dispute concerning the material facts because the factual allegations of Blizzard's Complaint are taken as true.  *Marcelos v. Dominguez*, 2009 U.S. Dist. LEXIS 5306, at *11 (N.D. Cal. Jan. 16, 2009).  In any event, the facts alleged in the Complaint are straightforward, are confirmed by Blizzard's investigation, the evidence, and the technology itself, and are not subject to reasonable dispute.

(**6**)    ***Possibility of Excusable Neglect***:  Under the sixth *Eitel* factor, the Court considers whether Bossland's default resulted from excusable neglect.  *Eitel*, 782 F.2d at 1471-72.  There is no excusable neglect.  Bossland **deliberately** chose not to answer or file a responsive pleading.  Mayer Decl., ¶¶ 4-8.  It did so despite the fact that it was represented by counsel and appeared in this action several times, including to seek additional time to respond and to contest jurisdiction.  *Id.* *See Meadows v. Dom. Rep.*, 817 F.2d 517, 521 (9th Cir. 1987) ("A defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and failed to answer.").

(**7**)    ***Policy for Deciding Case on the Merits***:  The final *Eitel* factor considers the preference for deciding cases on the merits.  *Eitel*, 782 F.2d at 1471-72.  "However, this factor, standing alone, cannot suffice to prevent entry of default judgment for otherwise default judgment could never be entered."  *Caridi*,

346 F. Supp. 2d at 1073.  Indeed, Rule 55 specifically authorizes the termination of a case before a hearing on the merits in these precise circumstances.  *See Bryant*, 2004 U.S. Dist. LEXIS 26700, at *13.  Here, the only reason this lawsuit cannot proceed to the merits is because Bossland has deliberately chosen not to appear and defend this action.

In sum, the balance of *Eitel* factors weigh in Blizzard's favor, and the Court should grant this motion and enter default judgment against Bossland.

## V.   BLIZZARD'S REQUESTED RELIEF IS APPROPRIATE

### A.   Blizzard Is Entitled To The Requested Permanent Injunction.

The Copyright Act specifically authorizes the Court to grant injunctive relief to "prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  Likewise, the DMCA authorizes the Court to issue temporary or permanent injunctions "on such terms as it deems reasonable to prevent or restrain a violation . . . ."  17 U.S.C. § 1203(b)(1).  A permanent injunction is appropriate where the plaintiff proves (1) irreparable injury, (2) the inadequacy of legal remedies, (3) the balance of hardships favor an injunction, and (4) "that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  All of these factors favor granting a permanent injunction against Bossland's infringing conduct within the United States.

***Irreparable Injury and Inadequate Legal Remedy***:  These two inquiries collapse into one.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219-20 (C.D. Cal 2007).  Both are present here.

First, the likelihood of future infringements (proven by the fact that Bossland ***continues*** to infringe to this day (Mayer Decl., ¶ 17)), establish irreparable injury.  *Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990) (granting injunction where "history of continuing infringement and a significant threat of future infringement remains"); *Microsoft Corp. v. Coppola*, 2007 U.S.

Dist. LEXIS 40515, at *9-10 (N.D. Cal. May 24, 2007) (granting permanent injunction where plaintiff continued to infringe despite actual notice of infringement).

Second, sufficient compensation by monetary damages is virtually impossible. In fact, even calculating Blizzard's actual damages to date is extremely difficult. In order to calculate Bossland's overall revenue or to correlate Blizzard's lost revenue to the number of users who have quit or been banned from the Blizzard Games by reason of the Bossland Hacks, Blizzard would need a substantial amount of discovery from Bossland. Bossland's deliberate default has precluded that discovery.

Moreover, Bossland goes to great lengths (including the software program known as "Tripwire," *see* Complt., ¶ 39) to prevent its products being detected. In addition to its Warden circumvention, Bossland counsels its users as to the best and most effective ways to avoid detection by Blizzard employees. Thus, identifying specific instances in which a user has used a Bossland Hack would be quite difficult.

Third, Bossland has taken, and is continuing to take, every measure to avoid being actually bound by a money judgment. Bossland makes no secret of its goal to hide behind principles of extraterritoriality and jurisdiction in an effort to operate with impunity. The difficulty in enforcing a judgment against Bossland also militates in favor of an injunction. *Lava Records, LLC v. Ates*, 2006 U.S. Dist. LEXIS 46683, at *12 (W.D. La. July 11, 2006) (awarding permanent injunction, in part, because of "the need to prevent irreparable harm to Plaintiffs, which will not be remedied by a damage award that may or may not be collectible").

Fourth, irreparable injury exists here because an award of monetary damages against Bossland likely will not prevent or deter the adverse, long-term effect on Blizzard's ability to exploit its copyrighted works. *See Grokster*, 518 F. Supp. 2d

Mitchell
Silberberg &
Knupp LLP

19

1  at 1217-18 (finding irreparable injury because defendant "induce[d] far more

2  infringement than it could ever possibly redress with damages").

3       Fifth, Bossland's infringement deprives Blizzard of the fundamental right of

4  a property owner to control how, by whom, and in what manner its works are used.

5  *See Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 968 (8th Cir.

6  2005).  The Bossland Hacks specifically harm Blizzard by using and exploiting

7  Blizzard's intellectual property in a manner not authorized or intended by Blizzard.

8  For this reason, and for those listed above, Bossland is causing Blizzard to suffer

9  irreparable injury, for which there is no adequate remedy at law.

10      ***Balance of Hardships***:  Likewise, the third factor favors granting Blizzard's

11  requested permanent injunction.  Many of the same reasons supporting a finding of

12  irreparable injury also show the extreme hardships faced by Blizzard.  *See*

13  *Grokster*, 518 F. Supp. 2d at 1220.  Conversely, Bossland would face little, if any,

14  hardship if the Court were to enter the permanent injunction.  Here, the permanent

15  injunction is narrowly tailored such that it prohibits only future infringing conduct

16  by Bossland and those under its control or direction,[1] and the injunction does not

17  limit Bossland's ability to engage in ***lawful*** business via the Internet.  Moreover, if

18  Bossland truly believed that it would suffer hardship from an injunction, it would

19  have defended this action.

20      ***Public Interest***:  The fourth and final factor also supports granting the

21  permanent injunction.  "[I]t is virtually axiomatic that the public interest can only

22  be served by upholding copyright protections and, correspondingly, preventing the

23  misappropriation of the skills, creative energies, and resources which are invested

24  in the protected work."  *Apple Computer, Inc. v. Franklin Computer Corp.,* 714

25  F.2d 1240, 1255 (3d Cir. 1983) (internal quotation marks and citation omitted).

26  Thus, Blizzard is entitled to a permanent injunction against Bossland.

27  _____

28  [1] Courts routinely issue permanent injunctions enjoining a defendant from infringing in the future.  *E.g., Bryant*, 2004 U.S. Dist. LEXIS 26700, at *19 n.4.

Mitchell
Silberberg &
Knupp LLP

1    ***Form of the Injunction*.**  As noted, the proposed injunction is narrowly

2    tailored to prevent only certain specific categories of unlawful conduct.  It would

3    not prevent Bossland from selling other software products that do not infringe

4    Blizzard's rights.  The same or similar language proposed by Blizzard here has

5    been used in many other injunctions – including an injunction issued by Judge

6    Selna in a case very similar to this one.  *See* Mayer Decl., ¶ 14, Exs. 5, 6. (*Ceiling*

7    *Fan* injunction, *LeagueSharp* injunction).

8         **B.      Blizzard Is Entitled To $8,563,600 In Minimum Statutory**

9              **Damages For Bossland's Violations Of The DMCA.**

10        Under the DMCA, a plaintiff is entitled to statutory damages of "not less

11   than $200 or more than $2,500 *per act* of circumvention, device, product,

12   component, offer, or performance of service, as the court considers just."  17

13   U.S.C. § 1203(c)(3)(A) (emphasis added).  In the analogous context of copyright

14   infringement, statutory damages can be awarded to compensate a plaintiff when

15   actual damages are inadequate or difficult to prove.  *See Nintendo of Am., Inc. v.*

16   *Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994); *Capitol Records, Inc. v.*

17   *Thomas-Rasset*, 799 F. Supp. 2d 999, 1011 (D. Minn. 2011) ("One purpose of

18   statutory damages under the Copyright Act is to act as a substitute for actual

19   damages when they are difficult to calculate."); *Malibu Media, LLC v.*

20   *Guastaferro*, 2015 U.S. Dist. LEXIS 99217, at *14 (E.D. Va. July 28, 2015)

21   ("[O]ne purpose of statutory damages is to approximate actual damages that are

22   difficult to prove.").  By seeking only the minimum amount allowed under the

23   DMCA, Blizzard seeks only compensation for the harm it has suffered (which is

24   hard to quantify); it does not seek the heightened punitive amount (though

25   Bossland's conduct clearly is willful).  *Nintendo of Am., Inc.*, 40 F.3d at 1011

26   ("The punitive and deterrent purposes explain the heightened *maximum* award . . .

27   .") (emphasis added).

28

Mitchell
Silberberg &
Knupp LLP

21

Awards of statutory damages for trafficking in circumvention devices are based on the number of distributions of each device or product. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright*, § 12A.13 (Rev. Ed.) (awards under § 1203(c)(3)(A) "can be compounded"); *see also Craigslist, Inc. v. Naturemarket, Inc.,* 694 F. Supp. 2d 1039, 1063-64 (N.D. Cal. 2010) (basing award on number of devices distributed); *Sony Computer Entm't Am., Inc. v. Divineo, Inc.,* 457 F. Supp. 2d 957, 966-67 (N.D. Cal. 2006) (same); *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1074 (N.D. Cal. 2005) (same). That is, Blizzard is entitled to a separate award for ***each download*** by an end-user of the Bossland Hacks. *Dish Network, L.L.C. v. SatFTA*, 2011 U.S. Dist. LEXIS 25038, at *20-*21 (N.D. Cal. Mar. 9, 2011) (awarding damages "on a per-download basis"); *Reeves,* 2010 U.S. Dist. LEXIS 85560, at *5 (statutory damages based on number of people who obtained circumvention device). Courts routinely award statutory damages as part of default judgments in cases involving violations of the DMCA. *See, e.g., Reeves*, 2010 U.S. Dist. LEXIS 85560, at *5; *Craigslist*, 694 F. Supp. 2d at 1063-64; *see also Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 63-64 (1st Cir. 2002).

In this case, Bossland itself submitted evidence demonstrating the number of individual downloads of its hacks in the United States. Mayer Decl., Ex. 7 (Letschew Decl.), ¶¶ 44-79. By Bossland's own count, its products have been downloaded ***no less than 118,939*** times since July of 2013 by users in the United States alone. *Id.* These figures purportedly reflect sales of all Bossland Products (14 in total), including the nine products Bossland purports to sell for games other than the Blizzard games.

While it is certainly the case that Bossland's Blizzard-related products account for the vast majority of its sales (as opposed to products for far less popular games such as "Path of Exile" or "Neverwinter"), for purposes of this motion Blizzard is prepared to assume that all of the products are of equal value.

1   Thus, at minimum, roughly 36% of Bossland's U.S. sales are of products for use

2   with the Blizzard Games.  In light of the foregoing, and given Bossland's

3   deliberate decision to default and avoid discovery, it is fair and reasonable to

4   assume that at least[2] 36% of those downloads were of the Bossland Hacks, and not

5   Bossland products for use with other games.  Thus, Blizzard is entitled to at least

6   *42,818* (roughly 36% of 118,939) separate statutory damages awards under the

7   DMCA.

8   In this case, Blizzard is only seeking the ***minimum*** statutory damages of

9   $200 per infringement, for a total of ***$8,563,600.00.***  While Blizzard would surely

10  be entitled to seek a larger amount, Blizzard seeks only minimum statutory

11  damages.  Blizzard does not seek such damages as a "punitive" measure against

12  Bossland or to obtain an unjustified windfall.  Rather, such damages are being

13  sought *in lieu* of actual damages or profits, *see* 17 U.S.C. § 1203(c)(2), because of

14  the difficulty of proving the precise amount of actual damages and Bossland's

15  refusal to participate in discovery into its profits.  Notably, $200 approximates the

16  cost of a one-year license for the Bossland Hacks.  So, it is very likely that

17  Bossland actually received far more than $8 million in connection with its sale of

18  the Bossland Hacks.

19  The statutory damages calculation proposed by Blizzard was applied by

20  Judge Wilson in *Blizzard Entm't, Inc. v. Reeves*, 2010 U.S. Dist. LEXIS 85560

21  (C.D. Cal. Aug. 10, 2010).  In *Reeves*, Blizzard brought DMCA claims against the

22  operator of a private, unauthorized computer game server (known as

23  "Scapegaming") that distributed circumvention software (targeted towards

24  Blizzard's "World of Warcraft" game) in the course of operating its service.  In its

25  motion for default judgment, Blizzard requested an award of statutory damages for

26

27  [2] Due to the overwhelming popularity of Blizzard's Games, this figure is extremely conservative.  In actuality, the Bossland Hacks targeted towards Blizzard's Games

28  likely make up the vast majority of Bossland's sales.

Mitchell
Silberberg &
Knupp LLP

23

1    each member of the Scapegaming community – a total of 427,393 members.  The

2    Court agreed:

> [I]t is reasonable to infer that defendant has provided
> each of its users with anti-circumvention products or
> services on at least one occasion.  Although Plaintiff is
> unable to prove this fact definitively, the Court must
> draw all reasonable inferences in Plaintiff's favor on
> account of defendant's failure to participate in the
> litigation process . . . . Accordingly, the Court concludes
> that each of the 427,393 community members
> downloaded, accessed, or otherwise used anti-
> circumvention software, services, or products.
> Defendant's website's primary purpose was to enable
> users to circumvent Plaintiff's technological protection
> measures, and defendant has failed to introduce any
> evidence showing that any of defendant's users were
> engaged in benign activities.  Accordingly, the Court
> concludes that the appropriate amount of statutory
> damages is $85,478,600 (that is, 427,393 users multiplied
> by the statutory minimum of $200 per "act of
> circumvention" and/or "performance of service"). To the
> extent that this figure appears unreasonably large,
> Congress has mandated this approach and the Court is
> unable to deviate from it.

15   *Reeves*, 2010 U.S. Dist. LEXIS 85560, at *8 (internal citations omitted).[3]  Here, the

16   minimum statutory damages award sought by Blizzard would be only a small

17   fraction of the amount awarded in *Reeves*.

18        **C.     Blizzard Is Entitled To Its Reasonable Attorneys' Fees And Costs.**

19        As the "prevailing party," Blizzard is entitled to an award of an attorneys'

20   fees and "full costs."  17 U.S.C. § 505*; see Twentieth Century Fox Film Corp. v.*

21   *Streeter*, 438 F. Supp. 2d 1065, 1073-74 (D. Ariz. 2006) (plaintiff securing default

22   judgment is "prevailing party").  Specifically, Blizzard is entitled to an award of

23   attorneys' fees in the amount of no less than ***$174,872.00***.  *See* L.R. 55-3 (for a

24   default judgment award in excess of $100,000, attorneys' fees are $5,600 plus 2%

25

26   [3] The amount sought here is far less than was sought in other DMCA cases.  *See,*
     *e.g., EchoStar Satellite LLC v. ViewTech, Inc.,* 2011 U.S. Dist. LEXIS 42709, at
27   *10-11 (S.D. Cal. Apr. 20, 2011) ($214,898,600); *Dish Network L.L.C. v. Ward,*
     2010 U.S. Dist. LEXIS 142090, at *20 (S.D. Fla. Jan. 8, 2010) ($51,148,200);
28   *Reeves*, 2010 U.S. Dist. LEXIS 85560, at *9 ($85,478,600).

Mitchell
Silberberg &
Knupp LLP

24

1  of the amount over $100,000).  This is based on *minimum* awardable statutory

2  damages.

3         Additionally, the Copyright Act allows for the recovery of "full costs."  17

4  U.S.C. § 505.  Blizzard's costs of suit in this action are $1,763.41.  Mayer Decl.,

5  ¶ 16, Ex. 8.

6

7  **VI.    CONCLUSION**

8         For the foregoing reasons, Blizzard respectfully requests that the Court enter

9  default judgment, and grant Blizzard the requested relief.

10

11  DATED: March 13, 2017            KARIN G. PAGNANELLI
                                     MARC E. MAYER
12                                   EMILY F. EVITT
                                     DANIEL A. KOHLER
13                                   MITCHELL SILBERBERG & KNUPP LLP

14

15                                   By:   /s/ Marc E. Mayer
16                                         Marc E. Mayer
                                           Attorneys for Plaintiff
17                                         Blizzard Entertainment, Inc.

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP