**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. SA CV 16-1236-DOC (KESx) | Date: March 31, 2017 |

Title: BLIZZARD ENTERTAINMENT, INC. V. BOSSLAND GMBH ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Deborah Goltz | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):** **ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT [31]**

Before the Court is Plaintiff's Motion for Default Judgment ("Motion") (Dkt. 31). The Court finds this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7-15. Having reviewed the moving papers, the Court GRANTS Plaintiff's Motion.

**I.     Background**

   **A.     Facts**

The following facts are drawn from the Plaintiff Blizzard Entertainment Inc.'s ("Blizzard" or "Plaintiff") Complaint ("Compl.") (Dkt. 1) and Plaintiff's Motion.

Blizzard is the developer of numerous popular multiplayer online computer games, including World of Warcraft, Diablo 3, Heroes of the Storm, Hearthstone, and, most recently, Overwatch (collectively, the "Blizzard Games"). *See* Compl. ¶ 13.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                         Date: March 31, 2017
                                                                                                                         Page 2

       Defendant Bossland GmbH ("Bossland" or "Defendant") is a German company that sells "Bots," also known as "Buddies," for each of the Blizzard Games. *Id.* ¶¶ 2, 10. While "Buddies" may sound benign, they are actually malicious software programs designed to allow their purchasers to cheat at Blizzard Games by circumventing the rules to gain an unfair advantage over other players. *Id.* ¶¶ 2, 28. These Buddies include "StormBuddy," "Hearthbuddy," "DemonBuddy," and the ironically named "HonorBuddy." *Id.* ¶ 29.

       Bossland's most recent cheat, "Overwatch Cheat," is advertised as an "ESP Advantage for Overwatch." *Id.* ¶¶ 32–33. Bossland sells licenses to use its Buddy Bots and Overwatch Cheat (collectively, the "Bossland Hacks") through its website for a recurring subscription of 12.95 Euros (approximately $14.50) per month, or an annual fee or 199 Euros (approximately $224). *Id.* ¶¶ 30, 34.

       Bossland offers users in the United States "technical support, customer service, and other advice" through their online forums or direct email correspondence. *Id.* ¶ 31. Some of this support includes advice on how to avoid being caught by Blizzard, how to download and install the Bossland Hacks, and how to most effectively use them in Blizzard Games. *Id.*

       To access, download, or play any of the Blizzard Games, users must create and register an account with Blizzard's proprietary "Battle.net system." *Id.* ¶ 24. To create the "Battle.net account," users must manifest their assent to the "Battle.net End User License Agreement" (the "EULA"). *Id.* Under the EULA, Blizzard licenses the right to download, copy, install, and play the Blizzard Games, subject to terms, restrictions, and conditions. *Id.* ¶ 25.

       In order to protect its games from cheating or unauthorized exploitation, Blizzard has developed and employs a software program called "Warden." *Id.* ¶ 21. Warden is a measure that "prevents unauthorized access to the Blizzard games, restricts users from loading unauthorized copies of the Blizzard Games, and otherwise monitors the game client and environment for malicious or unauthorized software processes." *Id.*

       Warden enforces Blizzard's rights by running targeted scans for the presence of "'signatures' of known unauthorized third-party programs" that facilitate cheating or allow for a modification of the game interface. *Id.* ¶ 22. If Warden detects that a user is engaged in hacking or cheating activities, it will deny access to that user. *Id.* As a result, for any hack or cheat software to be effective, it must be designed to prevent detection by Warden. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 16-1236-DOC (KESx)                        Date: March 31, 2017
                                                                                                                                Page 3

In addition, Blizzard uses encryption measures to protect the Blizzard Games from being exploited and manipulated by hackers and cheaters. *Id.* ¶ 23. These measures include "data pointers," which are used to ensure that hackers cannot locate critical gameplay data. *Id.*

One of the ways Bossland attempts to "avoid, bypass, or circumvent Warden" is through a software application known as "Tripwire." *Id.* ¶ 39. Tripwire is described by Bossland as "anti-spyware technology built into Bossland GmbH products to 'watch the watchers.'" *Id.* Blizzard believes that Tripwire is incorporated into each of the Bossland Hacks. *Id.* ¶ 40.

Bossland's conduct has forced Blizzard to spend enormous sums of money attempting to remediate the damage caused by the Bossland Hacks, including creating and releasing new versions of the Blizzard Games, responding to player complaints, employing personnel to police the Blizzard Games, and permanently deleting accounts of users employing the Bossland Hacks. *Id.* ¶ 48.

### B. Procedural History

Blizzard brought suit against Bossland on July 1, 2016 (Dkt. 1). Blizzard brings claims against Bossland for: (1) trafficking in circumvention devices in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201; (2) inducement to infringe copyright; (3) contributory copyright infringement; (4) vicarious copyright infringement; (5) intentional interference with contractual relations; and (6) unfair competition under California Business and Professions Code § 17200 *et seq*. *See id.*

On November 18, 2016, Bossland appeared in this action and filed a Motion to Dismiss Blizzard's Complaint for lack of personal jurisdiction (Dkt. 16). On January 25, 2017, the Court denied Bossland's Motion to Dismiss (Dkt. 23).

Blizzard filed the instant Motion on March 13, 2017. Bossland filed a Notice of Non-Opposition on March 20, 2017 (Dkt. 33).

### II. Legal Standard

Federal Rule of Civil Procedure 55(b) provides that the court may, in its discretion, order default judgment following the entry of default by the Clerk. Local Rule 55 sets forth procedural requirements that must be satisfied by a party moving for default judgment. Upon entry of default, the well-pleaded allegations of the complaint are taken as true, with the exception of allegations concerning the amount of damages. *See, e.g.*,

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. SA CV 16-1236-DOC (KESx) | Date: March 31, 2017 |
| | Page 4 |

*Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977). However, "necessary facts not contained in the pleading, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992). Where the pleadings are insufficient, the court may require the moving party to produce evidence in support of the motion for default judgment. *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).

When deciding whether to enter default judgment, courts consider the seven *Eitel* factors:
> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

If a plaintiff seeks money damages, "[t]he plaintiff is required to provide evidence of its damages, and the damages sought must not be different in kind or amount from those set forth in the complaint." Fed. R. Civ. P. 54(c). "When 'proving-up' damages, admissible evidence (including witness testimony) supporting . . . damage calculations is usually required." *Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011).

### III. Discussion

#### A. Procedural Requirements

Blizzard has satisfied the requirements of Local Rules 55-1 and 55-2 and Federal Rule of Civil Procedure 55(b). Blizzard has requested (Dkt. 28) and received an entry of default against Bossland (Dkt. 30). Bossland is a corporation, and therefore is neither an infant nor incompetent. Marc E. Mayer Declaration ("Mayer Decl.") ¶¶ 4–8. Having determined Blizzard's procedural compliance, the Court turns to the substance of Blizzard's Motion.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                      Date: March 31, 2017
                                                                                                                                           Page 5

       **B.**      *Eitel* **Factors**

The Court considers each of the *Eitel* factors in turn.

       **1.**      **Possibility of Prejudice to Plaintiff**

The first *Eitel* factor requires the Court to consider the harm to Blizzard if the Court does not grant default judgment. *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Absent default judgment in this case, Blizzard would be denied the right to judicial resolution of the claims presented, and would be without other recourse for recovery. *See id.*; *Elektra Entm't Group Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005). Accordingly, this factor weighs in favor of default.

       **2.**      **Merits and Sufficiency of Complaint**

Courts often consider the second and third *Eitel* factors together. *See PepsiCo*, 238 F. Supp. 2d at 1175. The second and third *Eitel* factors look to whether Blizzard's complaint has sufficiently stated a claim for relief. In its analysis of the second and third *Eitel* factors, courts accept as true all well-pleaded allegations regarding liability. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

Blizzard requests default judgment for (1) trafficking in circumvention devices in violation of the DMCA, 17 U.S.C. § 1201; (2) inducement to infringe copyright; (3) contributory copyright infringement; (4) vicarious copyright infringement; and (5) intentional interference with contractual relations. Mot. at 11.

            **a.**      **Violation of DMCA**

Section 1201(a)(2) of the DMCA prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that—

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected [by copyright];
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected [by copyright]; or
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 16-1236-DOC (KESx)                          Date: March 31, 2017
                                                                                                                                Page 6

>   technological measure that effectively controls access to a work
>   protected [by copyright].

17 U.S.C. § 1201(a)(2).

In order to establish liability under this section, Blizzard must establish that Bossland violated one of the three prongs. *See* 17 U.S.C. § 1201(a)(2). Blizzard argues that it meets subsection (A), contending that Bossland hacks are "primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected [by copyright.]" *Id.*

Here, Blizzard's games include technological measures, such as Warden, that "effectively control access to the Blizzard Games." Mot. at 12. Warden is "primarily designed or produced" to prevent unauthorized access to the Blizzard Games, restrict users from loading unauthorized copies, and monitor the game environment for unauthorized software processes. Compl. ¶ 21.

Bossland Hacks incorporate technology that is "designed to avoid, bypass, or circumvent technological measures," including Warden. Compl. ¶ 38; Mot. at 12. Bossland accomplishes this through a "Tripwire." *Id.* ¶ 39. Blizzard alleges that Tripwire's sole purpose is to avoid detection by Warden. *Id.* ¶ 40. Further, Blizzard alleges that Bossland Hacks have no other commercial value or appeal other than to circumvent a technological measure that controls access to a copyrighted work. Compl. ¶ 40; Mot. at 13.

Therefore, Blizzard has properly pleaded that Bossland violated the first of the three prongs under 17 U.S.C. § 1201(a)(2), because Blizzard has pleaded that Bossland Hacks are designed to circumvent technological measures that control access to a copyright-protected work.

### b.     Copyright Infringement

As an initial matter, the Court must first determine whether direct infringement exists before addressing the issue of secondary infringement. To establish copyright infringement, a plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *L.A. Printex Industries, Inc. v. Aeropastale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012), *as amended on denial of reh'g and reh'g on banc* (June 13, 2012). A defendant infringes willfully if he acted with "knowledge that its conduct constitutes an act of infringement." *Oracle Am., Inc. v. Google Inc.*, 131 F. Supp. 3d 946, 949 (N.D. Cal. 2015).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 16-1236-DOC (KESx)  Date: March 31, 2017
Page 7

Blizzard is the publisher and owner of all rights, title, and interest in the Blizzard Games, and thus, the owner of a copyright. Compl. ¶ 9. Pursuant to 17 U.S.C. § 106(1)–(3), Blizzard possesses the exclusive rights to reproduce, distribute, and create derivate works of the Blizzard Games. *See* 17 U.S.C. § 106 ("[T]he owner of copyright . . . has the exclusive rights . . . (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale . . . .").

The Ninth Circuit has held that "copying," for the purposes of copyright law, occurs when a computer program is transferred from a permanent storage device to a computer's random access memory. *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993), *cert. dismissed*, 510 U.S. 1033 (1994). Here, Blizzard alleges that Bossland employees "fraudulently obtained access" to Blizzard's software code for the Blizzard Games. Mot. at 13; *see also* Compl. ¶ 41. From there, Bossland engaged in acts of "unauthorized reproduction, adaption, and/or distribution" of the Blizzard Games in the process of creating or maintaining the Bossland Hacks. Compl. ¶¶ 42–43. Further, Blizzard alleges it never authorized Bossland to engage in any of these acts, and that this conduct is expressly prohibited in the EULA. *See id.* ¶ 25 ("You agree that you will not, in whole or in part or under any circumstances . . . copy or reproduce . . . , translate, reverse engineer, derive source code from, modify, disassemble, decompile, or create derivate works . . . .").

Blizzard also alleges that when users download, install, and use the Bossland Hacks, they create a derivative work of the video game. *See* Compl. ¶¶ 65, 71. For example, "Overwatch Tyrant generates a dynamic screen overlay which it then incorporates into Overwatch's screen display." Mot. at 14; *see also* Compl. ¶¶ 35–36. Thus, Blizzard has established the copying of the copyright protected work.

Therefore, Blizzard has properly alleged there was direct copyright infringement. The Court will now determine whether Bossland is secondarily liable for this infringement.

### c.   Inducement to Infringe Copyright

Inducement to infringe copyright requires distribution of a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005). Evidence of "active steps . . . taken to

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                              Date: March 31, 2017
                                                                                                                                 Page 8

encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the produce be used to infringe." *Id.* at 936.

Blizzard alleges that Bossland encourages and induces third party "freelancers" to fraudulently obtain access to the Blizzard Games, and then to engage in the unauthorized reproduction of the Blizzard Games. Compl. ¶ 65. Bossland also encourages users of the Bossland Hacks to create derivate works—when users download, install, and use the hacks, they alter the Blizzard Games' gameplay and presentation which creates a derivative work of the video game. *Id.*; Mot. at 14. Bossland advertises these uses by offering advice on its online forums on how to avoid Blizzard's detection of a player's Buddy Bots usage and how to most effectively use the Buddy Bots in the Blizzard Games. *Id.* ¶ 31.

Therefore, Blizzard has properly alleged that Bossland is secondarily liable for inducement to infringe copyright.

### d.     Contributory Copyright Infringement

To be liable for contributory copyright infringement, the defendant must have knowledge, or reason to have knowledge, of direct infringement and must provide material assistance to the infringer. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019–22 (9th Cir. 2001). Put differently, liability exists if the defendant engages in "personal conduct that encourages or assists the infringement." *Id.* at 1019 (quoting *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998)).

Bossland materially contributes to infringement by creating the Bossland Hacks, making the Bossland Hacks available to the public, instructing users how to install and operate the Bossland Hacks, and enabling users to use the software to create derivative works. Compl. ¶ 71; Mot. at 15.

Therefore, Blizzard has properly alleged that Bossland is secondarily liable for contributory copyright infringement.

### e.     Vicarious Copyright Infringement

A party may be vicariously liable if it "has the right and ability to supervise the infringing activity and also has a direct financial interest in the infringing activities." *Napster*, 239 F.3d at 1022 (quoting *Gershwin*, 443 F.2d at 1162).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                        Date: March 31, 2017
                                                                                                                 Page 9

       Bossland receives a direct financial benefit from the infringement. Financial benefit exists where the availability of infringing material "acts as a 'draw' for customers." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263–64 (9th Cir. 1996) (stating that financial benefit may be shown "where infringing performances enhance the attractiveness of a venue"). Bossland sells subscriptions for each of its Bossland Hacks through its website at a cost of 12.95 Euros (approximately $14.50) per month or between 24.98 and 199 Euros (approximately $28 to $224) for a yearly subscription. Compl. ¶¶ 30, 34.

       Bossland also has the right and ability to supervise and control the infringing conduct of users within the United States. One can infringe vicariously "by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930 (internal citations omitted). Here, Bossland profits from the direct infringement of Blizzard Games and does not attempt to stop the infringement. Instead, Bossland encourages and induces its customers to use its Bossland Hacks and counsels its customers on how to avoid being caught by Blizzard. Comp. ¶ 46.

       Therefore, Blizzard has properly alleged that Bossland is liable for vicarious copyright infringement.

### f.     Intentional Interference with Contractual Relations

       In California, the elements of intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998) (internal quotation marks and citation omitted). The third element incorporates a causation requirement that these intentional acts were a substantial factor in causing the breach. *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015 (C.D. Cal. 2013).

       Blizzard has established all five elements of intentional interference with contractual relations. First, all players of Blizzard Games must agree to the EULA before playing, which is a contract between Blizzard and the player. Compl. ¶ 24; *see also Blizzard Entm't Inc.*, 28 F. Supp. 3d at 1015 (finding that Blizzard's EULA was a valid existing contract between the game players and Blizzard).

       Second, Blizzard alleges that Bossland is aware of the EULA because Bossland encourages and directs its customers on how to avoid being caught by Blizzard when

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. SA CV 16-1236-DOC (KESx)                                          Date: March 31, 2017
                                                                                                                                                  Page 10

using the Bossland Hacks. Compl. ¶¶ 46, 85. Further, Bossland has its own Blizzard accounts and would have had to accept the EULA when it created those accounts. *Id.* ¶ 85.

Third, Bossland engaged in a number of intentional acts designed to induce the players of the Blizzard Games to breach the bot prohibition present in the EULA. Pursuant to the EULA, a user may not "[c]reate, use, offer, advertise, make available and/or distribute . . . Cheats [or] Bots." *Id.* ¶ 83. The evidence Blizzard presents establishes that the Bossland Hacks serve no other purpose other than to engage in cheating expressly prohibited by the EULA. *Id.* ¶¶ 53–54. These intentional acts include not only the design and sale of the Bossland Hacks, but also the counseling of its customers about how to avoid being caught by Blizzard, the creating of message boards to discuss Blizzard's policing activities, and the explaining of how to download and install the Bossland Hacks and how to effectively use the hacks in the Blizzard Games. *Id.* ¶¶ 31, 46.

Fourth, there is evidence that establishes multiple breaches of the bot prohibition in the EULA by players of the Blizzard Games, satisfying the fourth element. *Id.* ¶¶ 31, 48.

Fifth, Blizzard has established a showing of resulting damage or harm because Blizzard expends a substantial amount of money combating the use of the Bossland Hacks to ensure fair game play. *Id.* ¶ 87. This includes "creating and releasing new versions of the Blizzard Games that counteract the Bossland Hacks, responding to player complaints, employing personnel to police the games to detect the use of the Bossland Hacks, and 'banning' . . . users who are using the Bossland Hacks." *Id.* ¶ 48. Additionally, players of the Blizzard Games lodge complaints against cheating players, which has caused users to grow dissatisfied with the Blizzard Games and cease playing. *Id.* ¶ 48. Accordingly, the in-game cheating also harms Blizzard's goodwill and reputation. *Id.*

Therefore, Blizzard has properly alleged that Bossland intentionally interfered with Blizzard's contractual relations.

Taking the facts alleged in the Complaint as true, the Court concludes that Blizzard has sufficiently stated all of its claims. Accordingly, the second and third *Eitel* factors support entry of default judgment on Blizzard's claims.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                                   Date: March 31, 2017
                                                                                                                                      Page 11

### 3.     Sum of Money at Stake

The fourth *Eitel* factor requires the court to balance the amount of money at stake against the seriousness of the defendant's conduct. "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in relation to defendant's conduct." *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1012 (C.D. Cal. 2014). Here, Blizzard seeks an injunction, statutory damages in the amount of $8,563,600.00, attorneys' fees of $174,872.00, and costs in bringing the suit of $1,763.41. Mot. at 23–25. Because Blizzard has properly plead all of its claims and is only asking for the minimum statutory damage amount, the statutory damages request is proper. *See id.* at 21–23. Therefore, the amount of money at stake is proportional to Bossland's conduct. The injunctive relief is also proper because without it, Bossland would continue to infringe on the Blizzard Games.

Accordingly, the fourth *Eitel* factor weighs in favor of a grant of default judgment.

### 4.     Possibility of a Dispute Concerning Material Facts

The fifth *Eitel* factor requires the court to consider the possibility of dispute as to material facts in the case. Where a plaintiff's complaint is well-pleaded and the defendants make no effort to properly respond, the likelihood of disputed facts is very low. *See Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). "Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists." *Elektra Entm't Grp.*, 226 F.R.D. at 393. Accordingly, the fifth *Eitel* factor weighs in favor of default judgment.

### 5.     Possibility of Excusable Neglect

The sixth *Eitel* factor considers the possibility that a defendant's default resulted from excusable neglect. *Vogel*, 992 F. Supp. 2d at 1013; *see also Eitel*, 782 F.2d at 1471–72. Due process requires that interested parties be given notice of the pendency of the action and be afforded an opportunity to present its objections before a final judgment is rendered. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Here, there is no possiblity of excusable neglect because Bossland was properly served with a summons and complaint, filed a Motion to Dismiss, and filed a Notice of Non-Opposition. "Defendant's voluntary decision to allow default to be entered contradicts any argument for excusable neglect." *Adobe Sys. Inc. v. Kern*, No. C 09-1076 CW, 2009 WL 5218005, at *6 (N.D. Cal. Nov. 24, 2009). Accordingly, this factor weighs in favor of the entry of default judgment.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                          Date: March 31, 2017
                                                                                                      Page 12

### 6. Policy Favoring Decision on the Merits

The seventh *Eitel* factor requires the court to consider the strong judicial policy favoring decisions on the merits before granting default judgment. Whenever reasonably possible, cases should be decided upon their merits. *Eitel*, 782 F.2d at 1472; *PepsiCo*, 238 F. Supp. 2d at 1177. However, the policy favoring decisions on the merits does not prevent a court from entering judgment where a defendant refuses to respond. *Id.* at 1177. Here, the Court is unable to make a decision on the merits because Bossland has deliberately chosen not to defend this action. *See* Notice of Non-Opp'n. Accordingly, the seventh *Eitel* factor does not preclude the Court from entering default judgment against Bossland.

### 7. Conclusion

Taken together, the seven *Eitel* factors weigh in favor of granting default judgment against Bossland.

### C. Damages and Relief Sought

Blizzard seeks an injunction, statutory damages, attorneys' fees, and costs. Compl. at 26; Mot. at 18. Pursuant to Fed. R. Civ. P. 8(a)(3), a plaintiff's demand for relief must be specific and a plaintiff "must 'prove up' the amount of damages." *Elektra Entm't Group, Inc. v. Bryant*, No. CV 03-6381GAF (JTLx), 2004 WL 783123, at *5 (C.D. Cal. Feb. 13, 2004). Under Rule 54(c), relief sought in a motion for entry of default judgment is limited to that identified in the complaint. Fed R. Civ. P. 54(c).

### 1. Injunctive Relief

Blizzard seeks a permanent injunction enjoining Bossland's unlawful conduct. As set forth above, Blizzard has shown that it is entitled to judgment on each its DMCA claims. Section 1203(b)(1) of the DMCA authorizes the Court to "grant . . . permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation." Permanent injunctive relief is appropriate where a plaintiff demonstrates: (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships favors an equitable remedy; and (4) an issuance of an injunction is in the public's interest. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391–92 (2006).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. SA CV 16-1236-DOC (KESx) | Date: March 31, 2017 |
| | Page 13 |

### a. Irreparable Injury

First, there would be irreparable injury to Blizzard if an injunction is not granted. The infringement has affected Blizzard's ability to control its business reputation and Blizzard's customer goodwill. *See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm . . . ."). There is also a likelihood of future infringements if injunctive relief is not granted because Bossland continues to infringe to this day. Mayer Decl. ¶ 17; *see also Microsoft Corp. v. Coppola*, No. C 06-06701 WHA, 2007 WL 1520964, at *9 (N.D. Cal. May 27, 2007) (granting a permanent injunction where counter-defendant continued to infringe despite actual notice of infringement).

### b. Inadequate Remedy at Law

Second, there is no adequate remedy at law to address this ongoing damage and irreparable harm. "[T]he requisite analysis for the second factor of the four-factor test inevitably overlaps with that of the first . . . ." *Grokster*, 518 F. Supp. 2d at 1219 (quoting *MercExchange*, 500 F. Supp. 2d 556, 582 (E.D. Va. July 27, 2007)). As Blizzard has shown it would suffer an irreparable injury without the injunction, the Court agrees that money alone is not an adequate remedy. In addition to what is addressed above, Blizzard has been unable to determine the full extent of its damages because Bossland has refused to defend itself in this action.

### c. Balance of Hardships

Third, the balance of hardships weighs in favor of Blizzard, since an injunction will merely prohibit Bossland from engaging in future unlawful activity, and will not bar it from engaging in lawful business. "There is no hardship to a defendant when a permanent injunction would merely require the defendant to comply with the law." *Deckers Outdoor Corp. v. Ozwear Connection Pty. Ltd.*, No. CV 14-2307 RSWL (FFMx), 2014 WL 4679001, at *13 (C.D. Cal. Sept. 18, 2014).

### d. Public's Interest

Finally, the public interest is served when copyright law protections are enforced. *See Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 859 (C.D. Cal. 2006), *overruled on other grounds*, *Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ("[T]he public interest is also served when the rights of copyright holders are protected against

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                          Date: March 31, 2017
                                                                                                                          Page 14

acts likely constituting infringement."). Granting an injunction will protect Blizzard's copyrights against further infringement.

Accordingly, the Court finds that under the facts of this case, Blizzard is entitled to a permanent injunction.

Generally, an injunction must be narrowly tailored to remedy only the specific harms shown by a plaintiff, rather than enjoin all possible breaches of the law. *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

Here, Blizzard asks for a permanent injunction ordering "Bossland and all persons acting under its direction or control" to cease and desist from "distributing, advertising, marketing, selling, reselling, uploading, downloading, offering for sale, or otherwise disseminating" any software that infringes on any of Blizzard's intellectual property. Mot. at 1. Further, it also orders Bossland to cease and desist from assisting with the creation or development of infringing software; publishing or distributing the infringing software; selling, transferring or assigning infringing software; and operating any website designed to provide infringing software. *Id.* at 1–3. The Court is satisfied that Blizzard's requested injunction is not overly broad as it only prohibits future infringing conduct by Bossland and those under its control or direction. *See id.*

Therefore, the Court GRANTS Blizzard's request for a permanent injunction.

### 2.      Statutory Damages

Blizzard also contends that it is entitled to statutory damages in the amount of $8,563,600.00 for violations of the DMCA. Mot. at 21. Under the DMCA, a plaintiff is entitled to statutory damages of "not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." 17 U.S.C. § 1203(c)(3)(A).

In this case, Blizzard seeks an award of statutory damages using the minimum multiplier of $200. Mot. at 23. Blizzard argues that it is entitled to a separate award for each download by an end-user of the Bossland Hacks. *Id.* at 22. Courts in the Ninth Circuit have held that violations of the DMCA should be construed on a per-download basis. *See, e.g.*, *Dish Network, LLC v. SatFTA*, No. 5:08-cv-01561 JF (PSG), 2011 WL 856268 at *10 (N.D. Cal. Mar. 9, 2011) (awarding damages on a "per-download basis"); *Blizzard Entm't, Inc. v. Reeves*, No. CV 09-7621 SVW (AJWx), 2010 WL 4054095, at *9

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                        Date: March 31, 2017
                                                                                                       Page 15

(C.D. Cal. Aug. 10, 2010) (finding statutory damages were appropriate based on the number of people who obtained the circumvention device).

Here, Blizzard argues that Bossland's products have been downloaded no less than 118,939 times since July of 2013 by users in the United States. Mot. at 22. Bossland also provides hacks for non-Blizzard Games, and Blizzard estimates that roughly thirty-six percent of Bossland's United States sales are of hacks for Blizzard Games. *Id.* at 23. Accordingly, Blizzard asserts that Bossland committed at least 42,818 violations of the DMCA. *Id.* The Court finds that Blizzard's request for statutory damages is reasonable in light of the fact that Blizzard seeks the low end amount of damages and provided a reasonable download estimate.

Therefore, the Court AWARDS Blizzard $8,563,600.00 in statutory damages under the DMCA.

### 3.     Attorneys' Fees and Costs

Finally, Blizzard requests an award of attorneys' fees and full costs as the "prevailing party." Mot. at 24. Under the Copyright Act, "the court in its discretion may allow the recovery of full costs" and "may also award a reasonable attorney's fee to the prevailing party as part of the costs" for claims of copyright infringement. 17 U.S.C. § 505.

Blizzard calculated its attorneys' fees pursuant to Local Rule 55-3. Under Local Rule 55-3, when an applicable statute provides for the recovery of reasonable attorneys' fees, fees are calculated pursuant to the schedule set forth in the rule. For a judgment in excess of $100,000.00, attorneys' fees are $5,600 plus two percent of the amount over $100,000.00. L.R. 55-3. Here, $5,600 plus two percent of the amount of statutory damages over $100,000.00 amounts to $174,872.00. Accordingly, an award of $174,872.00 is appropriate under Local Rule 55-3.

Additionally, the Copyright Act allows for the recovery of full costs. *See* 17 U.S.C. § 505. Blizzard requests costs in the amount of $1,763.41. Mot. at 25; Mayer Decl. ¶ 16, Ex. 8. The Court finds this amount appropriate.

Therefore, the Court AWARDS Blizzard the requested attorneys' fees and costs.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SA CV 16-1236-DOC (KESx)                                            Date: March 31, 2017
                                                                                                                              Page 16

## IV.   DISPOSITION

For the foregoing reasons, the Court GRANTS Blizzard's Motion and request for a permanent injunction and AWARDS statutory damages in the amount of $8,563,600.00, attorneys' fees in the amount of $174,872.00, and costs in the amount of $1,763.41.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                                                  Initials of Deputy Clerk: djg
CIVIL-GEN